IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN RE BEHR DAYTON THERMAL     :
PRODUCTS LITIGATION

                            Case No. 3:08-cv-326

               :      JUDGE WALTER H. RICE

               :

---

DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT (DOC. #359); SUSTAINING IN
PART AND OVERRULING IN PART DEFENDANT ARAMARK
UNIFORM & CAREER APPAREL'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOC. #360); SUSTAINING IN PART AND
OVERRULING IN PART MAHLE BEHR DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #362); SUSTAINING IN PART AND
OVERRULING IN PART DEFENDANT OLD CARCO, LLC'S MOTION
FOR SUMMARY JUDGMENT (DOC. #365)

---

The Plaintiffs[1] in this consolidated action live in an area of Dayton, Ohio,

where the soil, groundwater and air is contaminated with volatile organic

compounds ("VOCs") from nearby industries. They seek damages under a variety

of theories from Defendants Old Carco, LLC (nominal defendant for now-bankrupt

Chrysler, LLC), Aramark Uniform & Career Apparel, LLC ("Aramark"), and Behr

---

[1] Named Plaintiffs include Terry Martin, Linda Russell, Nancy Smith and Deborah
Needham.

Dayton Thermal Products, LLC, now known as Mahle Behr Dayton, LLC, and Behr

America, Inc., now known as Mahle Behr USA, Inc. (collectively "Behr").

Pursuant to Fed. R. Civ. P. 23(c)(4), the Court has certified seven issues for class

treatment. Trial is set to begin on October 17, 2022.

This matter is currently before the Court on four pending motions: (1)

Plaintiffs' Motion for Partial Summary Judgment, Doc. #359; (2) Defendant

Aramark Uniform & Career Apparel's Motion for Partial Summary Judgment, Doc.

#360; (3) Mahle Behr Defendants' Motion for Summary Judgment, Doc. #362; and

(4) Old Carco, LLC's Motion for Summary Judgment, Doc. #365.

## I.    Background and Procedural History

The McCook Field neighborhood in Dayton, Ohio, is located near the

confluence of the Great Miami River and the Mad River. This area has been

declared a Superfund site because the groundwater and soil are contaminated

with volatile organic compounds ("VOCs"), including trichloroethylene ("TCE")

and tetrachloroethylene ("PCE"), that exceed recommended screening levels.

Such chemicals are known to cause cancer in humans. These VOCs have

allegedly risen through the groundwater and soil beneath Plaintiffs' homes to

cause vapor intrusion inside their homes. Approximately 240 homes in the

McCook Field neighborhood are affected, as well as two schools.

The VOCs at issue are thought to have originated from several industrial

manufacturing sites located immediately to the north of the McCook Field

neighborhood. There are two plumes of groundwater containing VOC contaminants. One is thought to have originated from the Behr Facility, which was previously owned and operated by Chrysler. This is known as the "Chrysler-Behr Plume." The second plume, which is situated within the Chrysler-Behr Plume, contains VOC contaminants allegedly originating from the Chrysler-Behr facility and the Aramark facility. This plume is known as the "Chrysler-Behr-Aramark Plume."

Chrysler owned and operated an automotive parts manufacturing facility on the site from 1936 until 2002, when the facility was purchased by Behr. It is undisputed that, from approximately the 1950s until the late 1970s or early 1980s, Chrysler used chlorinated solvents, including TCE, for degreasing and cleaning certain equipment. In 1969, "cleaning oil" was found in soil samples on Chrysler's property. In the 1970s, Chrysler also sporadically used PCE.

In 1987, Chrysler discovered liquid contaminated with TCE and PCE in a post hole it drilled in the concrete floor of one of its buildings. Over the next couple of years, dozens of gallons of liquid were removed from the post hole. Consultants hired by Chrysler found VOC contaminants in the drinking water and in the soil on Chrysler's property. In 1991, Chrysler discharged millions of gallons of water from its powerhouse well into the city storm sewers, knowing that the water contained TCE and PCE.

That same year, a consultant alerted Chrysler to the possibility that the VOC contaminants could migrate off-site downgradient of the plant, and recommended

3

that Chrysler evaluate the associated risks. Additional groundwater and soil testing was performed over the next few years and, in 1995, an investigation report again discussed the potential for off-site migration of VOC contaminants.

In 1998, groundwater samples detected dangerous levels of TCE and PCE at numerous locations on the Chrysler property. A soil gas survey indicated that concentrations of TCE, possibly originating from the Chrysler facility, were likely present in the residential area immediately to the south of the facility. That same year, Chrysler began operating a soil vapor extraction system on its own property and enrolled in the Ohio Environmental Protection Agency's ("Ohio EPA's") Voluntary Action Program.

Behr purchased the Chrysler facility in 2002. The asset purchase agreement required Chrysler to remediate the contamination, and to indemnify and retain liability for contamination of property other than its own. Working with the Ohio EPA, Chrysler continued efforts to remediate soil and groundwater contamination at the Behr facility. It evaluated groundwater flow, and installed soil vapor extraction systems and groundwater remediation systems that operated intermittently over the next few years.

In 2006, after the Ohio EPA evaluated the risk of vapor intrusion from the contaminated groundwater, the United States Environmental Protection Agency ("USEPA") got involved. Soil gas samples and indoor air samples collected from residences in the McCook Field neighborhood showed greatly elevated TCE concentrations in some of the structures. In December of that year, the USEPA

4

and Chrysler signed an Administrative Order by Consent, requiring Chrysler to remediate the contamination.

Chrysler began testing homes for vapor intrusion and installed vapor mitigation systems in dozens of structures. However, in 2009, Chrysler filed for bankruptcy and terminated all work at the site. Old Carco, LLC is the nominal defendant for Chrysler. Pursuant to a Unilateral Administrative Order issued by the USEPA, Behr later assumed responsibility for continued remediation.

Defendant Aramark owns and operates a commercial laundry facility located just south of the Chrysler-Behr facility. Aramark's predecessors used PCE in their dry-cleaning operations until 1987. In 1989, PCE was discovered in an underground storage tank that contained detergent. In 1992, Aramark learned that the soil and groundwater around its facility was contaminated with PCE. It installed four groundwater monitoring wells. A consultant identified the potential for off-site migration and recommended further sampling; however, Aramark took no action to address this risk. In 1996, Aramark used soil vapor extraction wells to remediate groundwater on its own property, and operated those wells through 2003.

Although the USEPA identified Aramark as a potentially responsible party, Aramark refused to take part in the remedial investigation and feasibility study. In September of 2021, however, Aramark and Behr agreed to design and implement the EPA's selected interim remedy for the site, which includes ongoing sampling and remediation.

Three separate lawsuits were filed in 2008, seeking damages for the contamination affecting the McCook Field neighborhood. These were eventually consolidated in the above-captioned case. A Third Master Complaint was filed in 2014, asserting claims of trespass, private nuisance, unjust enrichment, strict liability, negligence, negligence per se, battery, intentional fraudulent concealment, constructive fraud, negligent misrepresentation and civil conspiracy. Doc. #242.

Plaintiffs later filed an Amended Motion for Class Certification, Doc. #254. Therein, they asked the Court to certify, under Fed. R. Civ. P. 23(b)(3), a liability-only class with respect to the claims of private nuisance, negligence, negligence per se, strict liability and unjust enrichment. They planned to individually pursue the other six claims. The Court overruled the Rule 23(b)(3) class certification motion. Doc. #274. It did, however, agree to certify seven liability-related issues for class treatment under Fed. R. Civ. P. 23(c)(4).[2] That decision was affirmed by the Sixth Circuit Court of Appeals. *Martin v. Behr Dayton Thermal Products, LLC*, 896 F.3d 405 (6th Cir. 2018).

---

[2] If these issues are resolved in Plaintiffs' favor, individual trials for all viable claimants must be held to determine liability and damages on the claims of private nuisance, negligence, negligence per se, strict liability and unjust enrichment. The named Plaintiffs may then individually pursue their remaining claims for battery, trespass, civil conspiracy, constructive fraud, intentional fraudulent concealment and negligent misrepresentation.

The seven issues certified for class treatment are:

1.    Each Defendant's role in creating the contamination within their respective Plumes, including their historical operations, disposal practices, and chemical usage;

2.    Whether or not it was foreseeable to Chrysler and Aramark that their improper handling and disposal of TCE and/or PCE could cause the Behr-DTP and Aramark Plumes, respectively, and subsequent injuries;

3.    Whether Chrysler, Behr, and/or Aramark engaged in abnormally dangerous activities for which they are strictly liable;

4.    Whether contamination from the Chrysler-Behr Facility underlies the Chrysler-Behr and Chrysler-Behr-Aramark Class Areas;

5.    Whether contamination from the Aramark Facility underlies the Chrysler-Behr-Aramark Class Area;

6.    Whether Chrysler and/or Aramark's contamination, and all three Defendants' inaction, caused class members to incur the potential for vapor intrusion; and

7.    Whether Defendants negligently failed to investigate and remediate the contamination at and flowing from their respective Facilities.

Four summary judgment motions are currently pending: (1) Plaintiffs' Motion for Partial Summary Judgment on Certified Issues ##4 and 5, Doc. #359; (2) Defendant Aramark Uniform and Career Apparel's Motion for Partial Summary Judgment on Certified Issues ##2, 3, 6 and 7, Doc. #360; (3) Mahle Behr Defendants' Motion for Summary Judgment on Certified Issues ##1, 3, 6 and 7, Doc. #362; and (4) Old Carco, LLC's Motion for Summary Judgment on all

Certified Issues, Doc. #365. After these motions were fully briefed, the Court held an oral argument on May 12, 2022.

## II.    Fed. R. Civ. P. 56

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support

of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe; credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2726 (3d ed. 1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). If it so chooses, however, a court may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." *Id.* (citations omitted).

III.    **Discussion**

Given the significant overlap of the arguments raised in the four motions for summary judgment, the Court will address the parties' arguments by Certified Issue, although not necessarily in order.

>    **Certified Issue #1:** *Each Defendant's role in creating the contamination within their respective Plumes, including their historical operations, disposal practices, and chemical usage*

Behr and Old Carco have each moved for summary judgment on Certified Issue #1. Plaintiffs argue that Certified Issue #1 is not amenable to summary judgment given the open-ended nature of the question presented. The Court agrees but, in any event, genuine issues of material fact preclude granting Defendants' motions on Certified Issue #1.

The Court turns first to Behr's motion. It is undisputed that the two Plumes of contamination were present long before Behr purchased the facility from

10

Chrysler in 2002. It is also undisputed that Behr never used or disposed of TCE or PCE in its operations at the facility. Behr therefore argues that summary judgment is warranted on the question of whether Behr played any part in "creating" the contamination in the Plume Areas.

Plaintiffs argue, however, that, based on the evidence presented, a reasonable jury could find that Behr's failure to take action to prevent further off-site migration of TCE and PCE contributed to the contamination in the Plumes. That off-site migration allegedly continued long after Behr purchased the Chrysler facility in 2002. Plaintiffs' standard-of-care expert, Matt Hagemann, has opined that "[a]s a direct result of Behr's violations of the standard of care, off-site migration of the TCE-and-PCE-contaminated groundwater into the Class Areas continued unabated and Behr should have foreseen that the contamination would impact homes downgradient via the vapor intrusion pathway." Doc. #361-3, PageID#12867.

Hagemann's opinion supports a finding that, even though it is undisputed that Behr did not *directly* contribute TCE or PCE to the Plumes, it nevertheless played a role in "creating" some of the contamination within those Plumes. The Court therefore OVERRULES Behr's motion for summary judgment on Certified Issue #1.

Old Carco has also moved for summary judgment on Certified Issue #1. Its arguments are lumped together with arguments raised in support of its motion for summary judgment on Certified Issue #2. Old Carco argues that Plaintiffs cannot

11

prove that Old Carco negligently used, handled, or disposed of TCE or PCE

because: (1) Plaintiffs fail to present expert testimony of an applicable standard of

care relating to Chrysler's use and handling of TCE and PCE; and (2) Plaintiffs

cannot demonstrate that Chrysler *negligently* disposed of TCE or PCE, or that any

allegedly improper disposal had any nexus to Plaintiffs' alleged injury.

These arguments, which go to the ultimate *merits* of Plaintiffs' claims, will

be addressed in connection with Certified Issue #2. However, they are only

tangentially related to the question of Chrysler's "role in creating the

contamination" within the two Plumes. It is undisputed that Chrysler used TCE

and PCE in its historical operations, and that Chrysler played *some* role in creating

the groundwater contamination within the Plumes. There are, however, many

unresolved questions concerning the details of specific releases and their effect

on the environment. The Court therefore also OVERRULES Old Carco's motion for

summary judgment on Certified Issue #1.

> **Certified Issue #2**: *Whether or not it was foreseeable to Chrysler and Aramark that their improper handling and disposal of TCE and/or PCE could cause the Behr-DTP and Aramark Plumes, respectively, and subsequent injuries*

Aramark and Old Carco have moved for summary judgment on Certified

Issue #2. In order to succeed on any of their negligence-based claims, Plaintiffs

must prove: "(1) a duty requiring the defendant to conform to a certain standard

of conduct, (2) breach of that duty, (3) a causal connection between the breach

12

and injury, and (4) damages." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 928 (Ohio 2015). The existence of a duty hinges on the foreseeability of injury. *Id.* As Old Carco points out, foreseeability of injury cannot be determined until the specific acts of negligence have been identified. Certified Issue #2 concerns Plaintiffs' claims of improper "handling and disposal" of TCE and PCE.

Although the question presented is focused on the question of *foreseeability*, Aramark notes that Certified Issue #2 presupposes a finding of improper handling and disposal. Aramark correctly notes that, because historical industry standards and applicable regulations concerning the handling and disposal of VOCs during the relevant time period are outside the knowledge of the ordinary juror, expert witness testimony is required. Aramark then argues that, because Matt Hagemann, Plaintiffs' standard-of-care expert, has no opinion on whether Aramark improperly *handled or disposed* of TCE or PCE, the Court need not reach the question of foreseeability of injury. The Court agrees.

Hagemann opines that Aramark violated the standard of care with respect to its *failure to investigate* and *remediate* the contamination after it discovered PCE in an underground storage tank in 1989. These claims are addressed in Certified Issue #7. Plaintiffs, however, offer no expert witness testimony on the question of whether Aramark or its predecessors negligently *handled* or *disposed* of PCE or TCE. Hagemann notes that a former employee recalled mopping up a

spill of PCE in the 1980s before it reached the drain, but Hagemann offers no opinion on whether this violated the standard of care.

Plaintiffs also argue that "handling" could be defined broadly enough to encompass Aramark's "conduct with regard to the powerhouse well." Doc. #376, PageID#16274. It appears that Plaintiffs have inadvertently confused Aramark with Chrysler. Hagemann did opine that *Chrysler* violated the standard of care when it operated its powerhouse well, knowing that it would result in the discharge of PCE and TCE into the storm sewer system, but his report makes no reference to Aramark in connection with a "powerhouse well."

Citing CERCLA[3] case law, Plaintiffs also argue that the term "disposal" can include permitting hazardous waste to migrate off-site. Plaintiffs, however, are not seeking relief under CERCLA and, even if they were, the Sixth Circuit has held that passive migration does not constitute a "disposal" under CERCLA. *Bob's Beverage, Inc. v. Acme, Inc.*, 264 F.3d 692, 697-98 (6th Cir. 2001) (citing *United States v. 150 Acres of Land*, 204 F.3d 698, 704 (6th Cir. 2000)).

Aramark's alleged failure to investigate and remediate contamination to prevent off-site migration is addressed in Certified Issue #7. The Court agrees with Aramark that, because Plaintiffs have presented no expert witness opinion on the question of whether Aramark breached the standard of care with respect to its *handling* or *disposal* of TCE or PCE, there is no reason to reach the question of

---

[3] CERCLA is the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.*

foreseeability in the context of Certified Issue #2.  Given that there are no genuine issues of material fact, the Court SUSTAINS Aramark's motion for summary judgment on Certified Issue #2.

Old Carco likewise seeks summary judgment on Certified Issue #2.  Unlike with Aramark, Plaintiffs have presented expert witness testimony that creates a genuine issue of material fact on the underlying question of whether Chrysler negligently *handled or disposed* of TCE and/or PCE.

Matt Hagemann first opines that Chrysler breached the standard of care with respect to its handling of the TCE and PCE in connection with the "post hole" incident.  In 1987, Chrysler drilled a hole through the concrete floor in Building 40B to install a guard post.  Oil and water containing TCE and PCE seeped up through that hole.  For several months, the liquid was dipped out of the hole at least every two weeks and placed in a 55-gallon drum.  In 1988, however, the liquid overflowed the hole.  An internal memo stated, "we do not want hazardous waste spilling on the floor and being tracked through the plant."[4]

Hagemann opines that Chrysler violated the standard of care by drilling the post hole without consulting maps showing six storm sewer pipes under Building 40B, by failing to report to the National Response Center the release of a

---

[4]  The parties disagree over the proper interpretation of this memo.  Plaintiffs maintain that it indicates that hazardous waste had *already* been tracked through the plant.  Old Carco maintains that it indicates that Chrysler intended to take preventative action so that hazardous waste *would not be* tracked through the plant.  Both interpretations are reasonable.

reportable quantity of hazardous waste, and by failing to produce evidence of proper disposal of the liquid taken from the post hole.

Hagemann also opines that Chrysler breached the standard of care with respect to the pumping of the powerhouse well, which was used as a backup for cooling water. In 1989, high levels of chlorinated solvents were detected in that well. In 1990-91, in an attempt to evaluate the contamination levels in the groundwater, Chrysler, against the advice of one of its managers, decided to pump the powerhouse well for 90 days. Over those three months, 90 million gallons of contaminated water was discharged into the storm sewers. Hagemann opines that Chrysler's operation of this well, knowing that it would result in the discharge of TCE and PCE into the storm sewer system and interconnected rivers and streams in the area, violated the standard of care.[5]

Hagemann further opines that Chrysler breached the standard of care in July of 1998, when it failed to report that levels of TCE exceeding acceptable screening limits were found in liquid pumped from one of its sewers. He also notes that there is no evidence of proper disposal of this contaminated liquid.

Old Carco disagrees with Hagemann's conclusion that Chrysler's conduct related to these incidents violated the applicable standard of care. It notes that

---

[5] Old Carco argues that, because Chrysler had a permit for industrial discharges, the discharge from the powerhouse well cannot be considered a "disposal" of hazardous waste under RCRA. 42 U.S.C. § 6903(27); 40 C.F.R. §261.4(a)(2); 40 C.F.R. § 261.3. As Plaintiffs note, however, this does not necessarily preclude a finding that Chrysler was negligent under Ohio law.

much of the challenged conduct occurred prior to the enactment of federal

statutes and regulations regulating the use of TCE and PCE, and argues that

Hagemann's reliance on later-adopted provisions to establish the standard of care

is flawed. Hagemann's expert witness opinions, however, are also based on his

extensive training and experience. The Court finds that Hagemann's report and

deposition testimony are sufficient to create a genuine issue of material fact on

the question of whether Chrysler's conduct violated the standard of care with

respect to its handling and disposal of TCE and/or PCE.[6]

Old Carco next argues that Hagemann provides no causal connection

between the allegedly improper disposal of TCE and PCE and the vapor intrusion

in Plaintiffs' homes. Although the question of proximate cause is ultimately one

for the jury, it is also intertwined with the question of foreseeability. Certified

Issue #2 asks whether it was foreseeable to Chrysler that its improper handling

and disposal of TCE and/or PCE could cause the Plumes of contamination and

subsequent injuries.

With respect to the post-hole incident, Old Carco notes that Hagemann

admits that the contaminated liquid taken from the hole was put in 55-gallon

---

[6] Old Carco points out that Hagemann has identified no violations of the standard of care related to its *operational handling* of TCE and PCE prior to the time Chrysler phased out their use in the early 1980s. The three incidents identified by Hagemann occurred several years later. The Court, however, rejects Old Carco's suggestion that Chrysler could no longer "handle" TCE and/or PCE after ceasing their operational use. These VOCs were still present on Chrysler's property such that they could be "handled" and "disposed of" even after Chrysler stopped using them.

drums. There is, however, no evidence showing how Chrysler disposed of those drums. Old Carco maintains that, even if some small amount of contaminated liquid were tracked through the plant, there is no evidence of a nexus between that and the vapor intrusion in the Class Areas.

These points are well-taken. Hagemann has also opined, however, that it was Chrysler's *failure to report* the release of a reportable quantity of hazardous waste removed from the post hole that allowed the TCE and PCE to spread off-site to Plaintiffs' properties. He maintains that, if Chrysler had complied with reporting requirements in 1987, the environmental agencies could have determined whether there was a need for a response action and taken steps to prevent off-site migration. This supports a finding that it was foreseeable that Chrysler's improper handling of TCE and PCE could cause the Plumes and subsequent injuries.

With respect to the TCE found in the pipes when Chrysler cleaned its sewers in 1998, Old Carco notes that there is no evidence that the TCE was improperly disposed of. Hagemann, however, again opines that Chrysler violated the standard of care by failing to report a reportable quantity of hazardous waste, thereby delaying a regulatory response that would have led to efforts to prevent the further spread of contaminants to Plaintiffs' properties. Again, this supports a finding of foreseeability.

With respect to the discharge of 90 million gallons of contaminated water from the powerhouse well into the city storm sewer, Old Carco notes that

18

Hagemann admitted that he had not specifically looked at how that discharge could have caused vapor intrusion in the Class Areas. For example, he did not know exactly where the sewer pipes traveled or whether the pipes in the Class Areas had any leaks. Plaintiffs note, however, that clay sewer pipes were discovered in 1987 when Chrysler dug the post hole in the same building where the powerhouse well was located and, according to Hagemann, clay sewer pipes are notoriously leaky. Moreover, when Chrysler discharged the contaminated water from the powerhouse well, it did so against the advice of its own manager who warned that pumping the well into the storm sewers could place the corporation at risk. Based on the evidence presented, a reasonable jury could find that it was foreseeable that Chrysler's discharge of 90 million gallons of contaminated water into the clay sewer pipes upgradient of Plaintiffs' properties would contaminate the groundwater and lead to vapor intrusion in Plaintiffs' homes.

In the Court's view, Plaintiffs have presented sufficient evidence to create a genuine issue of material fact concerning a causal connection between Chrysler's alleged improper handling and disposal of TCE and PCE and Plaintiffs' subsequent injuries. The Court therefore turns to the question of foreseeability which is at the heart of Certified Issue #2.

Old Carco argues that the risk of vapor intrusion was not reasonably foreseeable at the time of the incidents in question. It maintains that, during the relevant time period – the late 1980s and early 1990s – burial and evaporation

19

were common industrial disposal methods, and it was not yet understood that spills or releases would harm the environment or create a risk of vapor intrusion. Old Carco further notes that, even though the Ohio EPA was actively involved at the site, it was not concerned about the risk of vapor intrusion until several years later.

Hagemann, however, testified that the risk of vapor intrusion from contaminated soil and groundwater was known as early as 1987. Doc. #379-5, PageID##18719-20, 18723-24. In addition, Plaintiffs cite to several peer-reviewed articles from that time period addressing vapor intrusion pathways. *See* Nazaroff *et al.*, *Experiments on Pollutant Transport from Soil into Residential Basements by Pressure Driven Air Flow*, 21 Environ. Sci. & Tech. 459-66 (1987); R.R. Dupont, *Measurement of Volatile Hazardous Organic Emissions from Land Treatment Facilities*, Air Pollution Control Ass'n 168-76 (1987); K. Garbesis & R.G. Sextro, *Modeling Field Evidence of Pressure Driven Entry of Soil Gas into a House Through Permeable Below Grade Walls*, 21 Environ. Sci. & Tech. 1481-87 (1989); Kliest, *et al.*, *The Relationship Between Soil Contaminated with Volatile Organic Compounds and Indoor Air Pollution*, 15 Env't Int'l 419-25 (1989).

Based on the foregoing, the Court finds that genuine issues of material fact preclude summary judgment on the question of whether it was foreseeable that Chrysler's allegedly improper handling and disposal of TCE and/or PCE could cause the Plumes and Plaintiffs' subsequent injuries. Accordingly, the Court OVERRULES Old Carco's motion for summary judgment on Certified Issue #2.

20

**Certified Issue #3** *Whether Chrysler, Behr, and/or Aramark engaged in abnormally dangerous activities for which they are strictly liable*

Aramark, Behr and Old Carco have all moved for summary judgment on Certified Issue #3. For the reasons set forth below, the Court finds that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law.[7]

The law imposes strict liability for harm caused by abnormally dangerous activity. This legal doctrine has its roots in *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), an English case involving a defendant who built a reservoir on his land. Through no negligence of his own, the reservoir burst, causing water to flood and damage plaintiff's neighboring coal mine. He was held strictly liable for damage caused by his "non-natural" use of the land. "[I]t seems but reasonable and just that the neighbor who has brought something on his own property which was not naturally there, harmless to others so long as it is confined to his own property, but which he knows to be mischievous if it gets on his neighbor's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property." *Id.*

Citing *Rylands*, along with *Defiance Water Co. v. Olinger*, 54 Ohio St. 532 (1896), and *Bradford Glycerine Co. v. St. Marys Woolen Mfg. Co.*, 60 Ohio St. 560

---

[7] Absent disputed facts, the court may find, as a matter of law, that an activity is not abnormally dangerous. *See e.g., Slack v. Fort Defiance Constr. & Supply, Inc.*, No. 03AP-1268, 2004 WL 2806310, at *3 (Ohio Ct. App. Dec. 7, 2004).

(1899), Plaintiffs argue that Ohio common law still provides for recovery under a theory of strict liability for harm caused when a substance escapes from one's land and damages neighboring property. In *Bradford Glycerine*, a tank of nitroglycerine exploded, damaging several nearby properties. The court held that, because the storage of nitroglycerine is an extraordinary and unusual use of property, the strict liability rule of *Fletcher v. Rylands* applied. 60 Ohio St. at 574-75. *Defiance Water*, however, is inapposite. There, a decrepit water tank collapsed, and the escaping water crushed a house located below. Although the court discussed the *Rylands'* holding, it found that the doctrine of strict liability was inapplicable, given that the plaintiff sought damages only under a theory of negligence. 54 Ohio St. at 540.

Defendants acknowledge that the doctrine of strict liability is rooted in *Rylands.* They argue, however, that the doctrine has been narrowed significantly and that the current relevant law is set forth in the Restatement (Second) of Torts §§ 519 and 520 (1977). Section 519 establishes the elements of strict liability for harm caused by abnormally dangerous activity as follows:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519 (1977).

"Although Restatement Section 519 has never been explicitly adopted by the courts of Ohio, the rule nevertheless appears to be an accurate restatement of Ohio law on this issue." *Doherty v. Ohio State Univ.*, No. 89AP-746, 1990 WL 86772, at *3 n.1 (Ohio Ct. App. June 26, 1990) (citing *Bradford Glycerine*, 60 Ohio St. 560; *O'Day v. Shouvlin* (1922), 104 Ohio St. 519; *Walczesky v. Horvitz Co.* (1971), 26 Ohio St. 2d 146)). *See also In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 2:13-MD-2433, 2015 WL 4092866, at *17 (S.D. Ohio July 6, 2015) (Sargus, C.J.) (noting that Ohio looks to the Restatement (Second) of Torts to determine strict liability for abnormally dangerous activity); *Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 639 (N.D. Ohio 2014) (citing Restatement (Second) of Torts § 519).

Section 520 sets forth several factors which are relevant to the determination of whether an activity is abnormally dangerous:

> (1) existence of high degree of risk of harm;
> (2) likelihood that resulting harm will be great;
> (3) inability to eliminate the risk by the exercise of reasonable care;
> (4) extent to which activity is not a matter of common usage;
> (5) inappropriateness of activity to place where it is carried on; and
> (6) extent to which value to the community is outweighed by dangerous attributes.

Restatement (Second) of Torts § 520 (1977). Not all factors need be present, especially if some factors weigh heavily. *Id.* at cmt. f.

As an initial matter, the Court must determine what the relevant "activity" is in this case. Defendants maintain that it is the use, handling and disposal of PCE and TCE. Plaintiffs, however, argue that the relevant activity is Defendants'

23

use, handling and disposal of PCE and TCE *in a manner that allowed these chemicals to escape onto Plaintiffs' properties*. The Court agrees with Old Carco that Plaintiffs' view conflates the doctrines of negligence and strict liability. Strict liability imposes liability regardless of any action taken to mitigate the risk. The relevant question, therefore, is whether, *under Ohio law*, the use, handling and disposal of TCE and PCE constitutes an abnormally dangerous activity such that Defendants are subject to strict liability regardless of fault.[8]

Under Ohio law, "[t]he types of activities that qualify as ultrahazardous/ abnormally dangerous is quite limited. . . .To come within the doctrine, courts have found that the activity must have an immediate, high risk of great physical harm to those in close proximity, which high risk cannot be reduced through the exercise of due care." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 2015 WL 4092866, at *16 (citing *Caveny v. Raven Arms Co.*, 665 F. Supp. 530, 532 (S.D. Ohio 1987) *aff'd*, 849 F.2d 608 (6th Cir. 1988)). *See also Elmer v. S.H. Bell Co.*, 127 F. Supp. 3d 812, 828 (N.D. Ohio 2015) ("Generally, Ohio courts only find that an activity is ultrahazardous in four scenarios: blasting, transportation or storage of explosives, cases involving dangerous animals, nuclear accidents, and when examining ultrahazardous activity as an affirmative defense."); *Crawford v.*

---

[8]  The parties have cited to dozens of cases from other states, some holding that the use, handling and disposal of such chemicals constitutes an abnormally dangerous activity and others holding that it does not. They acknowledge that there is very little Ohio case law directly on point.

*Nat. Lead Co.*, 784 F. Supp. 439, 444 (S.D. Ohio 1989) (Spiegel, J.) (holding that the production of uranium constitutes an abnormally dangerous activity).

In the case of *In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litigation*, Judge Sargus addressed the question of whether the use, generation and release of C-8 (ammonium perfluorooctanoate) from an industrial plant constitutes an abnormally dangerous activity under Ohio law. Noting the narrow class of activities recognized as "abnormally dangerous," he found that Ohio law did not support a claim of strict liability in that case. 2015 WL 4092866, at *19.[9]

Having considered the relevant factors set forth in § 520 of the Restatement, this Court likewise finds that the use, handling and disposal of TCE and PCE does not constitute an abnormally dangerous activity under Ohio law. The first factor to be considered is existence of a high degree of risk of harm; the second is the likelihood that the resulting harm will be great. Plaintiffs argue that these factors weigh in their favor. They note that so many carcinogenic chemicals were released that their entire neighborhood has been declared a Superfund site. Defendants do not dispute that TCE and PCE are hazardous chemicals known to

_____

[9] Plaintiffs cite to *Green v. Begley Co.*, No. 1:08cv77, 2008 WL 4449065, at *3 (S.D. Ohio Sept. 29, 2008), in which Judge Barrett held that the plaintiff, who alleged that the defendant was engaged in abnormally dangerous activity based on the use of chemicals used in the dry cleaning process, had adequately stated a claim for strict liability under Ohio law. Given the fact that the court was ruling on a motion to dismiss and had to accept the facts alleged as true, and given the lack of any discussion of relevant Ohio case law, the Court gives little weight to the *Green* opinion.

cause cancer in humans. Nor do they dispute the gravity of the resulting harm. They note, however, that the use, handling and disposal of TCE and PCE poses no *immediate* risk of great physical harm to those in close proximity in the same way that explosives or dangerous animals might. *See In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 2015 WL 4092866, at *16.

More importantly, however, the high degree of risk associated with these industrial solvents can be largely eliminated with the exercise of reasonable care. Old Carco notes that Plaintiffs themselves have admitted that the releases of TCE at the Chrysler facility could have been avoided by the use of reasonable care. The third favor therefore cuts heavily in favor of Defendants.

The fourth and fifth factors also cut heavily in Defendants' favor. During the relevant time period, TCE and PCE were commonly used as solvents in a wide variety of industrial settings, including dry cleaning, metal degreasing and parts cleaning. Given the numerous industries located in this particular area of Dayton, it cannot be said that it was inappropriate to use these chemicals in those facilities. The fact that these industries were located directly north of the McCook Field neighborhood does not change the equation.

For example, in *Bradford Glycerine*, the Ohio Supreme Court compared and contrasted the risks associated with the storage of nitroglycerine with the risks associated with the use of steam. Although both activities posed the risk of explosion, the storage of nitroglycerin was fairly rare, whereas steam was employed in almost every industry at that time. Without steam, the factories

26

where people worked would not exist. As such, unlike the storage of nitroglycerine, the steam boiler could not be deemed such a menace that it must be "driven from the centers of population." 60 Ohio St. at 572-73. The court held that, in the case of steam boilers, "a modification of the strict rule of liability in favor of those who employ [them]," may be warranted. *Id.* at 573. As was the case with the steam boilers, TCE and PCE were widely used in many industrial settings during the relevant time period. As such, although the use of these chemicals posed certain health risks, strict liability is not necessarily warranted.

The final factor to be considered is the extent to which value to the community is outweighed by dangerous attributes. The industries that used the TCE and PCE provided employment to local residents. They also provided valuable services such as dry cleaning and the manufacturing of automotive parts. On the other hand, the use of these chemicals posed significant risks to the people in the nearby homes. This factor does not weigh heavily in favor of either party.

Having reviewed all relevant factors and Ohio case law addressing the question of what constitutes an abnormally dangerous activity, the Court concludes, as a matter of law, that the use, handling and disposal of TCE and PCE does not fall within the very narrow scope of activities for which Ohio imposes strict liability. The Court therefore SUSTAINS Defendants' motions for summary judgment on Certified Issue #3.[10]

───────────────

[10] Given the Court's finding that Defendants cannot be held strictly liable for their use, handling or disposal of TCE and PCE, the Court need not address the

**Certified Issue #6:** *Whether Chrysler and/or Aramark's contamination, and all three Defendants' inaction, caused class members to incur the potential for vapor intrusion,* and **Certified Issue #7:** *Whether Defendants negligently failed to investigate and remediate the contamination at and flowing from their respective Facilities*

Aramark, Behr and Old Carco have all moved for summary judgment on Certified Issues #6 and #7. Having considered the parties' arguments and the evidence presented, the Court concludes that genuine issues of material fact preclude summary judgment in favor of any defendant on these two issues.

Certified Issue #6 asks whether Chrysler and/or Aramark's contamination, and all three Defendants' inaction, caused class members to incur the potential for vapor intrusion. Aramark and Old Carco note that the Court has already held that the mere *potential* for vapor intrusion is not a cognizable injury. To recover damages, each Plaintiff must prove that vapors exceeding risk-based concentrations have *actually* invaded their homes. Defendants maintain that this is the law of the case, and that Certified Issue #6 is, therefore, irrelevant.

The Court disagrees that the issue is irrelevant. Although the mere potential for vapor intrusion is not independently actionable, Certified Issue #6 goes to the question of *general* causation. Unless the jury determines that a particular Defendant's acts or omissions were *capable* of causing vapor intrusion

---

question of successor liability. Likewise, it need not address the question of whether Behr, even though it never used TCE or PCE in its own manufacturing process, can nevertheless be held strictly liable for its alleged conduct in allowing chemicals previously generated by Chrysler to migrate off-site.

in the Class Areas, there is no need to address the other elements of Plaintiffs'
claims against that Defendant. However, if general causation is established, the
question becomes whether *specific* causation exists, *i.e.,* whether that Defendant's
acts or omissions actually caused vapor intrusion in each of the affected
properties.

The remainder of Aramark's motion for summary judgment on Certified
Issues ##6 and 7 hinges entirely on the admissibility of the testimony of Matt
Hagemann, Plaintiffs' standard-of-care expert. Aramark argues that, without his
expert witness testimony, Plaintiffs cannot prove negligent failure to investigate
and remediate the contamination. Given that the Court has overruled Defendants'
joint motion to strike Hagemann's report and testimony, Aramark's arguments in
this regard are moot. The Court therefore OVERRULES Aramark's motion for
summary judgment on Certified Issues ##6 and 7.

In its motion for summary judgment, Behr argues that summary judgment
is warranted on Certified Issues ##6 and 7 because, based on the evidence
presented, Plaintiffs cannot establish that Behr's alleged inaction proximately
caused contamination in the plumes or any injury to Plaintiffs. Behr again argues
that, according to Plaintiffs' expert, Nicole Sweetland, the plumes were formed
and the contamination migrated off-site long before Behr purchased the Chrysler
property in 2002. Behr maintains that nothing it could have done after that date
would have remediated the existing plumes. It also notes that, at the time of the

29

purchase, Chrysler was already working with the Ohio EPA to remediate the contamination.

The Court, however, agrees with Plaintiffs that a reasonable jury could find that Behr's inaction contributed to the plumes and caused the potential for vapor intrusion. Expert witness testimony shows that the off-site migration of TCE and PCE continued after 2002 and continues to this day. According to Sweetland, some of the monitoring wells located off site actually showed *increasing* levels of TCE in the groundwater after 2003. Moreover, Hagemann opines that if Behr had taken action to investigate and remediate the contamination when it bought the property from Chrysler, this would have reduced or prevented additional contamination across the Class Areas. Doc. #374-6, PageID#15923.[11] He maintains that, regardless of what remedial efforts Chrysler was already engaged in, Behr had an independent duty to investigate and remediate the contamination.

The Court concludes that there is a genuine issue of material fact as to whether Behr's inaction caused at least some class members to incur the potential for vapor intrusion.[12] Accordingly, the Court OVERRULES Behr's motion for summary judgment on Certified Issues ##6 and 7.

---

[11] Citing Ohio Model Jury Instructions on proximate cause, Plaintiffs note that so long as Behr's inaction was a "substantial factor" in producing the harm, it does not matter that there were other proximate causes of Plaintiffs' injuries.

[12] The Court need not, and does not, address Plaintiffs' alternative argument concerning the continuing tort doctrine.

As to Certified Issues #6 and #7, Old Carco argues that summary judgment is warranted because, based on the evidence presented, no reasonable jury could find that its alleged acts or omissions were the proximate cause of vapor intrusion in the Class Areas, or that Plaintiffs' injuries were foreseeable at the time. These topics were already addressed to some degree in the Court's discussion of Certified Issue #2, which focused on the foreseeability of whether Chrysler's improper *handling and disposal* of TCE and/or PCE could cause the Plumes of contamination and subsequent injuries. Certified Issues ##6 and 7 focus on Chrysler's alleged *failure to investigate and remediate*.

With respect to proximate cause, Matt Hagemann notes that, as early as 1987, after Chrysler discovered contaminated liquid in the post hole, consultants recommended that Chrysler investigate nearby aquifers and groundwater users, collect additional samples and install groundwater monitoring wells. He opined that, if Chrysler had heeded these recommendations, "the extent of contamination in soil and groundwater would have been delineated and on-and-off-site remediation could have been undertaken, preventing the spread to the downgradient neighborhood." Doc. #361-3, PageID#12896.

Old Carco, however, argues that, because the groundwater contamination which allegedly led to the vapor intrusion occurred prior to 1987, Plaintiffs cannot establish that Chrysler's inaction was the but-for cause of the alleged injuries. Old Carco contends that the damage occurred before Chrysler was aware of the need to investigate or remediate. Old Carco reasons that all releases of TCE and PCE

31

would have occurred prior to the early 1980s, when Chrysler ceased using them. Citing Nicole Sweetland, Old Carco argues that the VOCs would have traveled to the Class Areas within approximately seven years, *i.e.*, by 1987. According to Old Carco, Chrysler's alleged failure to investigate and take action to prevent off-site migration following the discovery of contaminated liquid in the post-hole in 1987 could not have been the cause of the vapor intrusion.

Plaintiffs, however, maintain that Old Carco has mischaracterized Sweetland's report. Sweetland opined that the upper aquifer beneath the Chrysler-Behr facility was contaminated with TCE and PCE no later than 1989 and that TCE from the facility would have encompassed the "Behr-DTP Plume area" and reached the Great Miami River, on average, by 1996. Doc. #379-15, PageID##19052-53. Under this scenario, a reasonable jury could find that Chrysler's alleged inaction following discovery of the contaminated liquid in the post hole in 1987 was a substantial factor in producing Plaintiffs' injuries.[13]

As to foreseeability, Old Carco again argues that the alleged injury--vapor intrusion--was not foreseeable prior to the early 2000s. It notes that the USEPA did not issue draft vapor intrusion guidance until 2002, and no other comprehensive guidelines for the assessment of the vapor intrusion pathway

---

[13] Plaintiffs also note that even if *some* contamination were already present in the Class Areas in 1987, there is no proof that the *entirety* of the Class Areas were contaminated prior to that date.

32

existed prior to that time. Old Carco further notes that the Ohio EPA did not consider the risk of vapor intrusion at the site until 2006.[14]

Plaintiffs' expert, Matt Hagemann, however, testified that vapor intrusion risks were foreseeable as early as 1987, and that a reasonable person would have investigated those risks. Doc. #379-5, PageID##18719-20, 18723-24. Old Carco disagrees with this opinion and claims that it is speculative. As previously noted, however, Plaintiffs have cited to several peer-reviewed articles from that time period addressing vapor intrusion pathways. Accordingly, the Court rejects Old Carco's claim that Hagemann's assessment of foreseeability is too speculative to withstand summary judgment.

For these reasons, the Court OVERRULES Old Carco's motion for summary judgment on Certified Issues ##6 and 7.

> **Certified Issue #4**: *Whether contamination from the Chrysler-Behr Facility underlies the Chrysler-Behr and Chrysler-Behr-Aramark Class Areas, and* **Certified Issue #5**: *Whether contamination from the Aramark Facility underlies the Chrysler-Behr-Aramark Class Area*

Plaintiffs and Old Carco have each moved for summary judgment on Certified Issues ##4 and 5. In its motion for summary judgment, Old Carco argues

---

[14] In support, Old Carco submitted the Declaration of Justin Kelley, an environmental contractor who performed work at the site. Doc. #365-4. Plaintiffs object to his Declaration on the basis that he was not disclosed as an expert witness. Old Carco notes, however, that Kelley is not offering expert opinions, but rather testifying about facts he observed firsthand. It further notes that Kelley was disclosed as a non-retained expert and potential fact witness.

only that Certified Issues ##4 and 5 cannot stand on their own. It argues that, if the Court grants summary judgment on the other Certified Issues, these two issues are legally irrelevant. The Court agrees. Nevertheless, given that the Court has overruled the motions for summary judgment related to the negligence-based claims asserted against Old Carco, the Court OVERRULES Old Carco's motion for summary judgment on Certified Issues ##4 and 5.

In their motion for summary judgment, Plaintiffs argue that, even though the parties' experts do not agree on the exact size, contours or concentrations of the two plumes of contamination, there is substantial overlap in their opinions. More importantly, there is no genuine issue of material fact as to whether TCE and/or PCE emanating from the Chrysler-Behr and Aramark facilities underlies at least *some portion* of the relevant Class Areas. Expert witnesses Nicole Sweetland, Peter Mesard, Jon Rohrer and David Folkes are all in agreement on this point. Plaintiffs therefore maintain that summary judgment is appropriate on Certified Issues ##4 and 5. Behr concedes that summary judgment on these two certified issues may be warranted.[15] Old Carco and Aramark do not.

As to Certified Issue #4, Old Carco argues that genuine issues of material fact concerning the scope and extent of TCE and/or PCE migration from the Chrysler facility preclude summary judgment. Old Carco acknowledges that

---

[15] Behr reiterates, however, that there is no evidence that Behr used TCE or PCE after purchasing the Chrysler facility in 2002. It therefore denies any suggestion that it contributed to the contamination in either plume.

Chrysler used TCE and PCE, and that some quantities of these chemicals migrated off-site and are likely contained in the groundwater beneath certain portions of the Class Areas. It denies, however, that this contamination currently underlies the *entirety* of the Class Areas. Old Carco maintains that, over the years, the plumes of contamination attributable to Chrysler have shrunk in size. It further argues that the contamination in some portions of the Class Areas is wholly attributable to third parties.[16]

However, it is irrelevant to Certified Issue #4 whether contamination attributable to the Chrysler facility currently underlies the *entirety* of the Class Areas. Likewise, it is irrelevant to the question certified whether some of the contamination currently underlying the Class Areas is attributable to third parties. These inquiries are relevant only to the questions of specific causation and damages and will be addressed at the individual trial phase. Certified Issue #4, however, is directed at the question of general causation.[17] The experts agree that contamination from the Chrysler-Behr facility underlies at least some portion of

---

[16] Old Carco has admitted, however, that in some portions of the Plumes, the TCE and PCE contamination is so comingled that individual sources cannot be determined.

[17] Old Carco argues that a summary judgment ruling on Certified Issue #4 will not aid efficiency because expert testimony on timing, concentrations, sources, impacts and proportional contributions of TCE and PCE by Defendants and others will be required to prove proximate causation and damages during the individual trial phase. Certified Issue #4, however, does help establish general causation. Unless contamination from the Chrysler-Behr facility underlies the Class Areas, there is no need to reach these other questions.

both Class Areas. The Court therefore SUSTAINS Plaintiffs' motion for summary judgment on Certified Issue #4.

Aramark argues that summary judgment is not warranted on Certified Issue #5. Like Old Carco, Aramark notes multiple disputes concerning the sources of the contaminants underlying the Class Area, the concentrations of the contaminants, the timing of the alleged releases, the effects of those releases, and the extent of the contamination. There are also disputes concerning whether PCE from Aramark reached the entire Chrysler-Behr-Aramark Class Area.[18] For the reasons set forth above, the Court finds that these disputes do not preclude summary judgment on the question certified.

Aramark maintains that there are genuine issues of material fact concerning whether TCE contamination in the Chrysler-Behr-Aramark Plume is attributable to Aramark. There is no evidence that Aramark ever used TCE or directly released any TCE into the environment. Nevertheless, it is undisputed that PCE was used at the facility, was found in underground storage tanks there, and was found in high concentrations in groundwater monitoring wells downgradient of the facility. The experts agree that PCE can degrade into TCE. Jon Rohrer, Aramark's expert witness, has opined that, given the aerobic nature of the shallow portion of the

---

[18] Aramark also challenges numerous factual statements made in connection with Plaintiffs' motion for summary judgment, but most are irrelevant to the question certified and need not be addressed at this time. For example, the question of *when* Aramark became aware that PCE contamination was migrating from the facility is irrelevant to the question of whether such contamination underlies the Class Area.

groundwater south of Aramark's facility, it is unlikely that the degradation of PCE allegedly emanating from that facility to TCE is occurring at a significant level. He did, however, find that *some* degradation was occurring.

Moreover, Rohrer specifically attributes some of the contamination in the Chrysler-Behr-Aramark Plume to the Aramark property. There is no genuine issue of material fact concerning whether contamination from the Aramark facility underlies at least some portion of the Chrysler-Behr-Aramark Class Area. The Court therefore SUSTAINS Plaintiffs' motion for summary judgment on Certified Issue #5.

## IV. Conclusion

For the reasons set forth above, the Court:

- SUSTAINS Plaintiffs' Motion for Partial Summary Judgment (Doc. #359);

- SUSTAINS IN PART AND OVERRULES IN PART Defendant Aramark Uniform & Career Apparel's Motion for Partial Summary Judgment (Doc. #360);

- SUSTAINS IN PART AND OVERRULES IN PART Mahle Behr Defendants' Motion for Summary Judgment (Doc. #362); and

- SUSTAINS IN PART AND OVERRULES IN PART Old Carco, LLC's Motion for Summary Judgment (Doc. #365).

Genuine issues of material fact preclude summary judgment on Certified Issues ## 1, 6 and 7. Although Aramark is entitled to summary judgment on Certified Issue #2, Old Carco is not. Defendants are entitled to summary judgment on Certified Issue #3, and Plaintiffs are entitled to summary judgment on Certified Issues ##4 and 5.

## V.     Special Interrogatories

In July of 2020, the parties submitted separate proposed Special Interrogatories via email, followed by briefs in support and responses, Docs. ##326, 327, 328, 329. The parties were able to resolve some, but not all, of their disagreements concerning the proposed Special Interrogatories to be submitted to the jury. The Court's ruling on the motions for summary judgment has negated the need for some of those Special Interrogatories. It may also have clarified some of the disputed issues and raised other questions not previously considered.

Given that trial is scheduled to begin on October 17, 2022, the Court would like to finalize the Special Interrogatories as soon as possible so that counsel has adequate time to prepare for trial. The Court DIRECTS counsel to confer and file, no later than close of business September 6, 2022, Joint Amended Proposed Special Interrogatories to be submitted to the jury.

To the extent that there are still areas of disagreement, they should be noted therein, along with a written explanation for the disagreement. The Court will resolve those disputes as quickly as possible.

Date: August 10, 2022

WALTER H. RICE
UNITED STATES DISTRICT JUDGE