IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN RE BEHR DAYTON THERMAL
PRODUCTS LITIGATION

:

:

:

Case No. 3:08-cv-326

JUDGE WALTER H. RICE

---

DECISION AND ENTRY OVERRULING PLAINTIFFS' MOTION TO
EXCLUDE TESTIMONY OF PETER M. MESARD AND JON ROHRER
(DOC. #358); OVERRULING DEFENDANTS' JOINT MOTION TO
STRIKE REPORT AND TESTIMONY OF MATT HAGEMANN (DOC.
#361)

---

The Plaintiffs in this consolidated action live in an area of Dayton, Ohio,

where the soil, groundwater and air is contaminated with volatile organic

compounds ("VOCs") from nearby industries. They seek damages under a variety

of theories from Defendants Old Carco, LLC (nominal defendant for now-bankrupt

Chrysler, LLC), Aramark Uniform & Career Apparel, LLC ("Aramark"), and Behr

Dayton Thermal Products, LLC, now known as Mahle Behr Dayton, LLC, and Behr

America, Inc., now known as Mahle Behr USA, Inc. (collectively "Behr").

Pursuant to Fed. R. Civ. P. 23(c)(4), the Court has certified seven issues for

class treatment. Trial is set to begin on October 17, 2022, with expert witnesses

testifying on several topics. This matter is currently before the Court on Plaintiffs'

Motion to Exclude Testimony of Peter M. Mesard and Jon Rohrer, Doc. #358, and

on Defendants' Joint Motion to Strike Report and Testimony of Matt Hagemann,

Doc. #361. The Court heard oral argument on these motions on May 12, 2022.

For the reasons set forth below, the Court overrules both motions.

## I.    Background and Procedural History

The McCook Field neighborhood in Dayton, Ohio, is located near the

confluence of the Great Miami River and the Mad River. This area has been

declared a Superfund site because the groundwater and soil are contaminated

with volatile organic compounds ("VOCs"), including trichloroethylene ("TCE")

and tetrachloroethylene ("PCE"), that exceed recommended screening levels.

Such chemicals are known to cause cancer in humans. These VOCs have

allegedly risen through the groundwater and soil beneath Plaintiffs' homes to

cause vapor intrusion inside their homes. Approximately 240 homes in the

McCook Field neighborhood are affected.

The VOCs at issue are thought to have originated from several industrial

manufacturing sites located immediately to the north of the McCook Field

neighborhood, including the Behr facility previously owned by Chrysler and

another facility owned by Aramark.

Chrysler owned and operated an automotive parts manufacturing facility on

the Site from 1936 until 2002, when the facility was purchased by Behr. From

approximately the 1950s until the late 1970s or early 1980s, Chrysler used

chlorinated solvents, including TCE, for degreasing and cleaning certain equipment. In the 1970s, it also sporadically used PCE. In 1987, Chrysler discovered liquid contaminated with TCE and PCE in a hole it drilled in the concrete floor of one of its buildings. In the late 1980s and early 1990s, consultants hired by Chrysler discovered VOC contaminants in the drinking water and in the soil on Chrysler's property. In 1991, a consultant alerted Chrysler to the risk of off-site migration. In 1998, Chrysler began operating a soil vapor extraction system on its own property and enrolled in the Ohio Environmental Protection Agency's ("Ohio EPA's") Voluntary Action Program.

Aramark owns and operates a nearby commercial laundry facility and previously used PCE in its operations. In 1992, it learned that the soil and groundwater around its facility was contaminated with PCE. A consultant identified the potential for off-site migration and recommended further sampling; however, Aramark took no action to address this risk. In 1996, Aramark used soil vapor extraction wells to remediate groundwater on its own property, and operated those wells through 2003.

No later than 1999, some of the VOC contaminants migrated from the Chrysler and Aramark properties to the McCook Field residential area. As early as 2000, Chrysler, along with the City of Dayton and the Ohio EPA, acknowledged this problem at several neighborhood meetings. Chrysler installed and sampled 75 groundwater monitoring wells in the area.

Behr purchased the Chrysler facility in 2002.  The asset purchase agreement required Chrysler to remediate the contamination, and to indemnify and retain liability for contamination of property other than its own.  Working with the Ohio EPA, Chrysler attempted to remediate soil and groundwater contamination at the Behr facility.  Nevertheless, in 2006, concentrations of TCE and PCE in the groundwater and in the soil gas still exceeded recommended screening levels, and the Ohio EPA became concerned that the vapor-phase chlorinated solvents could contaminate the air in McCook Field residences.

The United States Environmental Protection Agency ("USEPA") got involved and identified several potentially responsible parties.  In 2007, Chrysler began testing homes for vapor intrusion and installed vapor mitigation systems in those homes where the tests came back positive.  In 2008, it installed another soil vapor extraction system.  However, in 2009, Chrysler filed for bankruptcy and terminated all work at the Site.  Old Carco, LLC, is the nominal defendant for Chrysler.  Pursuant to a Unilateral Administrative Order issued by the USEPA, Behr and Aramark, the current landowners, assumed responsibility for continued remediation.

There are two plumes of VOC contaminants affecting the McCook Field neighborhood.  One is thought to have originated from the Behr Facility, which was previously owned and operated by Chrysler.  This is known as the "Chrysler-Behr Plume."  The second plume is situated within the Chrysler-Behr Plume and

allegedly contains VOC contaminants released from Aramark's facility.  This

plume is known as the "Chrysler-Behr-Aramark Plume."

Three separate lawsuits were filed in 2008, and eventually consolidated.  A

Third Master Complaint was filed in 2014, asserting claims of trespass, private

nuisance, unjust enrichment, strict liability, negligence, negligence per se, battery,

intentional fraudulent concealment, constructive fraud, negligent

misrepresentation and civil conspiracy.  Doc. #242.

Plaintiffs later filed an Amended Motion for Class Certification, Doc. #254.

Therein, they asked the Court to certify, under Fed. R. Civ. P. 23(b)(3), a liability-

only class with respect to the claims of private nuisance, negligence, negligence

per se, strict liability and unjust enrichment.  They planned to individually pursue

the other six claims.  The Court overruled the class certification motion.  Doc.

#274.  It did, however, agree to certify seven liability-related issues for class

treatment under Fed. R. Civ. P. 23(c)(4).  That decision was affirmed by the Sixth

Circuit Court of Appeals.  *Martin v. Behr Dayton Thermal Products, LLC*, 896 F.3d

405 (6th Cir. 2018).

The seven issues certified for class treatment are:

1.    Each Defendant's role in creating the contamination within
      their respective Plumes, including their historical operations,
      disposal practices, and chemical usage;

2.    Whether or not it was foreseeable to Chrysler and Aramark that
      their improper handling and disposal of TCE and/or PCE could
      cause the Behr-DTP and Aramark Plumes, respectively, and
      subsequent injuries;

5

3. Whether Chrysler, Behr, and/or Aramark engaged in abnormally dangerous activities for which they are strictly liable;

4. Whether contamination from the Chrysler-Behr Facility underlies the Chrysler-Behr and Chrysler-Behr-Aramark Class Areas;

5. Whether contamination from the Aramark Facility underlies the Chrysler-Behr-Aramark Class Area;

6. Whether Chrysler and/or Aramark's contamination, and all three Defendants' inaction, caused class members to incur the potential for vapor intrusion; and

7. Whether Defendants negligently failed to investigate and remediate the contamination at and flowing from their respective Facilities.

This matter is currently before the Court on Plaintiffs' Motion to Exclude Testimony of Peter M. Mesard and Jon Rohrer, Doc. #358, and on Defendants' Joint Motion to Strike Report and Testimony of Matt Hagemann, Doc. #361. At issue is whether these expert witnesses meet the standards for admissibility as set forth in Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

## II. Fed. R. Evid. 702 and *Daubert*

Federal Rule of Evidence 702, governing expert witness testimony, provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the trial judge must act as a gatekeeper, excluding expert witness testimony that is not both relevant and reliable. *Id.* at 589. "[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014) (citation omitted).

Although a hearing is not required, the court must "make an initial assessment of the relevance and reliability of the expert testimony." *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999). In this case, given the extensive briefing and oral argument, the Court finds that no separate *Daubert* hearing, with testimony from the expert witnesses, is needed in connection with either of the pending motions.

Relevant testimony is that which has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Civ. P. 401. Expert witness testimony must rest on a reliable foundation as opposed to unsupported speculation. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008). In determining whether expert witness testimony is sufficiently reliable, the court must focus "on [the] principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. Factors to be considered may include "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94).

Expert witness testimony is "inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Greenwell*, 184 F.3d at 497. However, the Sixth Circuit has cautioned that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citation omitted). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

III.     **Plaintiffs' Motion to Exclude Testimony of Peter M. Mesard and Jon Rohrer (Doc. #358)**

Defendant Old Carco, LLC, has retained Peter M. Mesard, P.E., P.G., as its expert witness to testify about the sources, nature and extent of the VOC contamination at issue, and the paths of migration. Defendant Aramark has retained Jon Rohrer, P.G., CHg., to testify about the same.

Plaintiffs maintain that Mesard and Rohrer fail to meet the standards for admissibility set forth in Fed. R. Evid. 702 and *Daubert*. Plaintiffs ask the Court to exclude their testimony altogether. In the alternative, Plaintiffs ask the Court to exclude any specific opinions that are based on flawed methodology and unfounded assumptions. For the reasons set forth below, the Court overrules Plaintiffs' motion in its entirety.

A.     **Peter M. Mesard, P.E., P.G.**

Plaintiffs do not dispute that Peter Mesard is well-qualified to offer an expert opinion in this case. He is a registered civil engineer in several states, a registered professional geologist in California and Utah, a certified engineering geologist and certified hydrogeologist in California, and a certified environmental manager in Nevada. He has extensive experience with environmental investigations and remediation projects, and has been qualified as an expert witness in federal and state courts.

Plaintiffs, however, challenge three specific methods that Mesard used to reach his conclusions in this case.[1] The first challenge involves the particle tracking analysis which Mesard used to determine the extent of the Chrysler-Behr Plume and contributions to that Plume by nonparty entities. It is undisputed that particle tracking analysis is a widely accepted method of determining the flow of contaminants in groundwater. Plaintiffs, however, argue that Mesard bases his opinions on a flawed and unreliable computer model that used 5-foot contour intervals instead of more precise 1-foot contour intervals.

Plaintiffs' expert witness, Dr. Nicole Sweetland, maintains that Mesard's use of 5-foot contour intervals failed to detect certain important underground topographical features, thereby producing results that do not match the physical reality of the area. According to Sweetland, Mesard's model shows particles of dissolved contaminants moving in inexplicable and physically impossible ways, *i.e.,* against the direction of the groundwater flow, and creates a groundwater discharge point that is quite different than the actual discharge point. Plaintiffs argue that this has the effect of downplaying the severity and geographical extent of the plume emanating from the Chrysler-Behr facility, and making it falsely

---

[1] Old Carco argues that, if Plaintiffs had simply taken Mesard's deposition, they could have easily resolved any purported "confusion" over his methodologies. Old Carco has attached a sworn Declaration from Mesard to its Response in Opposition to Plaintiffs' Motion, Doc. #372-1, in which Mesard responds to the three challenges raised by Plaintiffs.

appear that upgradient nonparty entities such as Gem City Engineering significantly contributed to the contamination in the Chrysler-Behr Plume.

Mesard explains, however, that he used 5-foot contour intervals to maintain consistency with historical groundwater data, which was available only in 5-foot intervals. He denies that this produced results inconsistent with hydrogeological principles. He further argues that, regardless of whether he used 1-foot or 5-foot intervals, the overall result would not differ significantly.

The Court finds that Plaintiffs' challenge to Mesard's particle tracking analysis goes to the weight of his testimony, not to its admissibility. As previously noted, particle tracking is a commonly used method of determining the flow of groundwater. The fact that Mesard may have reached a somewhat different conclusion had he used 1-foot intervals does not render his analysis fatally flawed. On cross-examination, Plaintiffs may, of course, inquire as to Mesard's reasons for using a 5-foot contour interval and explore how the use of a 1-foot contour interval may have changed his computer model.

In a similar vein, Plaintiffs challenge Mesard's designation of the monitoring well labeled "MW-45S" as a "hotspot"[2] for VOC contamination. Plaintiffs maintain that this well is not a "hotspot" but is instead connected to the rest of the Plume. Plaintiffs argue that Mesard's designation is based on "awkward" decisions and computer modeling and should be deemed unreliable.

---

[2] A "hotspot" is an area in which concentrations of contaminants are substantially higher than those in the surrounding area.

Mesard maintains, however, that his conclusion is based on actual sampling data of TCE concentrations in the area. He further notes that the USEPA also deemed MW-45S a "hotspot." Again, the Court finds that Plaintiffs' challenge goes only to the weight to be given Mesard's testimony. On cross-examination, Plaintiffs can explore the reasons why, on Mesard's computer model, MW-45S appears to be disconnected from the rest of the Plume.

Second, Plaintiffs challenge the "trendline" analysis that Mesard uses to delineate the Chrysler-Behr Plume and determine the extent of contamination originating from a specific source. According to Plaintiffs, he cherry-picked data to achieve his desired result. They claim that his methodology "forces" hotspots and underestimates the extent of the plume.

According to Plaintiffs, Mesard chose wells up to 350 feet from the centerline of his purported Plume and then projected the values back to the centerline, running regressions based on "imaginary" data. They further argue that he falsely represented cross-gradient wells as downgradient of each other. In addition, Plaintiffs argue that Mesard's trendline analysis has $R^2$ values too low to be of any significance. Although the EPA recommends using at least four datapoints, and statisticians recommend using at least ten, Mesard's 2008 evaluation uses only two datapoints and his 2012 evaluation uses only three. Plaintiffs also claim that his own groundwater flow values do not match the maps he cites.

12

Mesard maintains that his methods accurately model the size and extent of the Behr Plume, and that his approach follows methodology endorsed by the USEPA. He explains that there are two methods of trendline analysis, the "discrete" method and the more-conservative "continuous" method. The discrete method projects wells along the centerline, but the continuous method plots data points interpolated by the contouring algorithm directly along the centerline. Although he calculated results using both methods, he ultimately relied on the results of the continuous method. Given that Plaintiffs' criticisms are focused on the results of the discrete method, Mesard argues that they are misplaced.

Plaintiffs, however, argue that both methods rely on the same data points, which are allegedly flawed. In his Declaration, Mesard responds to Plaintiffs' criticisms. He argues that the centerline is consistent with the average direction of groundwater flow over four separate years. He denies that he falsely represented certain wells as downgradient. He admits that the $R^2$ values used in the discrete method were relatively low, but notes that the continuous method he relied upon had higher $R^2$ values. As to his use of a limited number of datapoints in the 2008 and 2012 evaluations, he claims that he used all data that was available for those years.

Again, a trendline analysis is a commonly used method of determining the extent of contamination emanating from a particular source. Although Plaintiffs' criticisms may impact the weight to be given to Mesard's conclusions, none warrants the exclusion of his testimony. During cross-examination, Plaintiffs may

13

further explore their criticisms of his methodology, including his alleged cherry-picking of certain data and its impact on his conclusions.

Third, Plaintiffs argue that Mesard's "chemical fingerprinting" of the Chrysler-Behr Plume is unreliable. Mesard uses this analysis to determine which portions of contamination within the Plume are attributable to Chrysler, and which are attributable to other sources. Where the concentration of chemicals changes, Mesard concludes that contaminants from third-party sources have intermingled with the contaminants attributable to Chrysler.

Plaintiffs argue, however, that this is not necessarily true. Given that chemicals decay, evaporate and spread at different rates, changes in concentration are not necessarily attributable to third parties. In addition, changes in chemical concentration may also be attributable to solvents that were purposely added to the groundwater. Plaintiffs maintain that Mesard failed to consider these alternative explanations. In his Declaration, however, Mesard points to those portions of his Report where he specifically considered these other possible explanations for the changes in the chemical fingerprint. Once again, Plaintiffs' criticisms go to the weight to be given his testimony and not its admissibility.

Having reviewed the parties' briefs and the statements made during oral argument, the Court finds that Peter Mesard is qualified to testify as an expert witness in this case. The Court further finds that Old Carco has shown, by a preponderance of the evidence, that Mesard's testimony is admissible under Fed.

14

R. Evid. 702. The Court therefore OVERRULES Plaintiffs' motion to exclude his testimony, Doc. #358.

### B. Jon Rohrer, P.G., CHg.

Jon Rohrer, P.G., CHg., is Aramark's expert witness. Again, there is no dispute as to his qualifications. He has a bachelor's degree in geological sciences and a master's degree in subsurface hydrology. He has more than 27 years of experience, including experience in groundwater contaminant plume source evaluation, historical industrial source identification and vapor intrusion migration.

Plaintiffs nevertheless challenge Rohrer's methodology and his conclusions.[3] Rohrer maintains that Plaintiffs' expert, Dr. Nicole Sweetland, failed to consider numerous potential contributors to the Chrysler-Behr Plume. Plaintiffs argue that Rohrer's opinions about these other sources of contamination are fatally flawed and will be "impossibly confusing" to a jury.

Plaintiffs first argue that Rohrer's conclusion -- that third parties, who were "potential" or "likely" users of VOCs, contributed to the Chrysler-Behr Plume -- is "impermissibly speculative." Rohrer, however, maintains that he relied on multiple, reliable lines of evidence to reach his conclusions. Having reviewed the record, the Court finds that Rohrer has presented sufficient evidence to submit this matter to the jury.

---

[3] As before, Aramark argues that Plaintiffs' misunderstandings of Rohrer's opinions could have been resolved if Plaintiffs had simply taken his deposition.

Plaintiffs further argue that Rohrer's conclusions are based on unreliable sampling, data collection, quality control and reporting methodologies, flaws that undermine the validity of the data. As to their claim that Rohrer used a sample that exceeded his self-imposed quality control limit, Rohrer notes that he flagged this sample with a "J" flag, a commonly-used notation indicating that the value of the sample in question is merely an estimate. Plaintiffs also challenge his reporting of "vertical gradients" at locations where only one depth level was sampled; Rohrer has corrected this clerical error to refine his opinion.

In addition, Plaintiffs challenge Rohrer's use of certain water samples with up to 6mm of airspace. The less airspace, the more accurate the reading. Although Plaintiffs argue that 6mm is excessive, their own expert has stated that 6mm is "an acceptable limit." Moreover, Rohrer again used a "J" flag in connection with the three samples (out of more than 70) that exceeded the 6mm limit. Again, Plaintiffs' criticisms do not warrant the exclusion of Rohrer's testimony. They merely go to the weight to be given to it.

Plaintiffs next maintain that Rohrer's opinions concerning alternative sources are based on insufficient data. They contend that it is unlikely that the third parties identified by Rohrer significantly contributed to the contamination at issue. More specifically, they challenge Rohrer's data as it relates to alleged contributions of B-N Plating and Clark and Casey Cleaners. Again, the Court finds that Plaintiffs' criticisms go to the weight of the evidence and not its admissibility.

16

Any disagreement between Rohrer and Sweetland concerning third parties as additional sources of contamination must be resolved at trial.

Plaintiffs further contend that Rohrer fails to account for key facts that contradict his conclusions concerning the source of VOC contamination inside certain homes. These include the presence of dirt floors in some basements and the presence of sub-slab depressurization systems that were installed to reduce the amount of VOC contaminants inside the homes. In response, Rohrer explains that he purposely used data sets developed prior to the installation of the sub-slab depressurization systems because this provided a more accurate picture of the sources of contamination.

Plaintiffs also maintain that Rohrer should have used more sensitive tests instead of assuming that if a test did not detect VOCs, the VOC level was at the non-detection threshold. Rohrer, however, notes that his decision to use non-detect thresholds is supported by USEPA guidance. In addition, Plaintiffs argue that Rohrer should not have collected samples from crawlspaces because the air there is not well mixed; Rohrer, however, denies collecting samples from crawlspaces. These challenges concerning the data he used again go to the weight to be given Rohrer's testimony.

Finally, Plaintiffs maintain that Rohrer's methodology in calculating PCE ratios is flawed. They argue that many of his ratios are based on single samples that are inherently unreliable, and that the Court should therefore reject his

17

opinions concerning additional sources. Rohrer notes, however, that Dr. Sweetland also relied on single samples in formulating her opinions.

In the Court's view, none of Plaintiffs' challenges warrants the exclusion of Rohrer's testimony. Disagreements between the experts concerning data collection techniques and the factual bases for Rohrer's opinions must be resolved by the trier of fact upon presentation of all the evidence. Any challenges to his methodology go to the weight to be given his testimony, and not its admissibility. Accordingly, the Court OVERRULES Plaintiffs' motion to exclude Rohrer's testimony, Doc. #388.

## IV.   Defendants' Joint Motion to Strike Report and Testimony of Matt Hagemann (Doc. #361)

Matt Hagemann, P.G., C.Hg., a hydrogeologist, is Plaintiffs' standard-of-care expert. He opines that Defendants breached the standard of care by failing to properly investigate and remediate VOC contamination on their own properties, and by ignoring consultants' recommendations to undertake a thorough investigation of the potential for off-site migration of the VOCs and take action to minimize the risks to neighboring properties. Defendants have jointly moved the Court for an order striking his expert witness report and testimony. Doc. #361.

Once again, Hagemann's qualifications as an expert witness are undisputed. He is a certified hydrogeologist who, for ten years, was the Senior Science Policy Advisor with the USEPA. In recent years, he has served as a

private consultant, and testified in numerous cases. Defendants nevertheless

argue that his opinions in this case are subjective and arbitrary, unmoored from

his experience and from the facts of the case. The Court disagrees.

Defendants claim that Hagemann's report fails to explain his methodology

and fails to clearly articulate the applicable standard of care. As to his

methodology, Hagemann explained that he reviewed case documents, and then

relied on his extensive professional experience, and his familiarity with federal

and state environmental protection laws and regulations, and guidance prepared

by and for the USEPA, to reach his conclusions about what the standard of care

required during the time frame in question. The Court finds that he has

adequately explained the methodology he used.

At his deposition, Hagemann testified that he Googled the term "standard

of care" to understand what it meant in a legal sense, *i.e.*, what a reasonable

person would do under the same or similar circumstances.[4] This does not mean,

as Defendants suggest, that Hagemann relied solely on an internet search to

determine the applicable standard of care. Citing other deposition testimony,

Defendants further argue that Hagemann relied only on his subjective beliefs

about what is right and wrong in formulating his opinions about Defendants'

---

[4] Defendants further argue that Hagemann did not incorporate Ohio tort law into his understanding of the standard of care. Quoting *Lee v. Javitch, Block & Rathbone LLP*, 601 F.3d 654, 659 (6th Cir. 2010), they note that "failing to take extraordinary measures which hindsight demonstrates would have been helpful" does not constitute negligence under Ohio law.

19

alleged violations of the standard of care. Defendants maintain that Hagemann's opinions are not based on statutes, regulations, guidance or generally accepted practices. Again, the Court disagrees.

Hagemann cites to numerous statutes, regulations and agency guidance as the basis for his opinions. Defendants, however, note that none of the authority he cites *required* them, at that time, to take the actions that he claims they should have taken. For example, although Hagemann opines that Aramark should have performed a phase one site assessment consistent with ASTM standards, those standards were not enacted until four years later.[5] Defendants also challenge Hagemann's reliance on EPA "guidance" which was prepared by third-party contractors for the EPA. However, the EPA stated that such documents should not be relied upon as agency policy.

Hagemann nevertheless argues that he properly relied on these documents because, even if they were not binding, they nevertheless reflected knowledge and prevailing industry practices at the time, and are therefore relevant to the question of what steps a reasonable person, in Defendants' shoes, would have done to alleviate the risks once they knew that VOCs had been released into the environment. The Court agrees that these documents are relevant for that purpose. The fact that Defendants were not statutorily required to take certain

---

[5] At his deposition, Hagemann admitted that his reliance on this ASTM document as to the standard of care as it existed at the time was erroneous. Doc. #361-4, PageID##12923-24.

steps to alleviate the risk is certainly relevant to the question of whether they violated the standard of care, but it does not necessarily preclude such a finding.

Defendants also take issue with documents that Hagemann relied on in opining that Behr should have conducted off-site evaluations of vapor intrusion as soon as it acquired the Chrysler property in 2002. Defendants maintain that, because Chrysler had already conducted an environmental assessment and was working with the Ohio Environmental Protection Agency ("Ohio EPA") to remediate the contamination, nothing required Behr to conduct further investigations. Hagemann concludes, however, that because the risks of vapor intrusion from off-site groundwater contamination were well-known by then, and because Chrysler was not taking appropriate action to remediate the off-site contamination, a reasonable person in Behr's shoes would have investigated and taken further action. The Court finds that Defendants' criticisms of the authority cited by Hagemann do not warrant the exclusion of his testimony.

Defendants next argue that Hagemann failed to consider the fact that they had been working with the Ohio EPA for several years to remediate contamination on their properties. Hagemann, however, opines that Aramark should have taken action above and beyond what the Ohio EPA required. As discussed above, he also opines that Behr should have undertaken other remediation efforts even though Chrysler was already working with the Ohio EPA in remediating the site.

Certainly, the fact that the Ohio EPA did not require Defendants to take further action to investigate and remediate the VOC contamination is relevant to

the question of whether they violated the standard of care. However, this does not necessarily insulate Defendants from a finding that their failure to take other action to prevent off-site migration fell below the standard of care. Hagemann notes that, shortly after the contamination was first discovered, consultants hired by Defendants recommended that they take action to investigate and mitigate the risk of off-site migration; Defendants, however, ignored those recommendations. According to Hagemann, had Defendants taken appropriate action at that time, the risk to Plaintiffs would have been minimized. Accordingly, Hagemann's alleged failure to consider Ohio EPA oversight does not render his opinions fatally flawed.

Finally, Defendants argue that Hagemann's interpretation of a 1987 internal memo from Chrysler is so flawed that it cannot form a reliable basis for his opinions. In 1987, Chrysler discovered oil and water in a post hole in the plant floor. An internal memo states, "[w]e do not want this hazardous waste spilling on the floor and being tracked throughout the plant." Doc. #361-8, PageID#12966. Defendants interpret this memo to mean that Chrysler planned to pump the contaminated liquid out of the hole so that it would never be tracked through the plant. Hagemann, however, interprets this statement to mean that it had already been tracked through the plant. Given that the memo also says that "[t]he waste was overflowing the hole and seeping from cracks in the floor," *id.,* Hagemann's interpretation cannot be deemed unreasonable.

Hagemann then opines that the lack of a manifest showing that this contaminated liquid was properly disposed of must mean that it was disposed of in an improper manner.  Defendants note that this is not necessarily true.  He further opines that Chrysler should have reported this spill to the U.S. EPA. Defendants disagree that they had a duty to do so, and further argue that Hagemann fails to make any connection between this alleged spill and Plaintiffs' injuries.  Again, these challenges are best explored on cross-examination.

Plaintiffs have shown, by a preponderance of the evidence, that Hagemann's testimony is both relevant and reliable.  In the Court's view, Defendants' criticisms of Hagemann's opinions go only to the weight to be given his testimony.  Hagemann's opinions are not purely subjective.  He used his years of training and experience, and his familiarity with applicable technical data, guidance, regulations and statutes to formulate his opinions concerning what was known about the risk that VOC contaminants would migrate offsite to Plaintiffs' properties, the risk of vapor intrusion in their homes, and the types of investigative and remedial efforts that Defendants should have undertaken.

Defendants also ask the Court to exclude Hagemann's testimony on the basis that its probative value is outweighed by the danger of unfair prejudice.  *See* Fed. R. Evid. 403.  They fear that, because of Hagemann's employment history with the USEPA, the jury will be unduly persuaded by his opinion that Defendants violated the standard of care and overlook his allegedly flawed reasoning.

Defendants, however, have not shown that the probative value of his testimony is substantially outweighed by the danger of unfair prejudice. Defendants are free to challenge Hagemann's conclusions through vigorous cross-examination and the presentation of contrary evidence. Moreover, the Court will instruct the jury that it need not accept Hagemann's opinion that Defendants violated the standard of care. The jury is free to accept or reject his opinions in whole or in part.

Accordingly, the Court OVERRULES Defendants' Joint Motion to Strike the Report and Testimony of Matt Hagemann, P.G., C.Hg., Doc. #361.

## V.     Conclusion

For the reasons set forth above, the Court OVERRULES Plaintiffs' Motion to Exclude Testimony of Peter M. Mesard and Jon Rohrer, Doc. #358, and Defendants' Joint Motion to Strike Report and Testimony of Matt Hagemann, Doc. #361.


Date: August 11, 2022               _Walter H. Rice_____
                                    WALTER H. RICE
                                    UNITED STATES DISTRICT JUDGE

24