**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **IN RE BEHR DAYTON THERMAL PRODUCTS, LLC** | : | **CASE NO. 3:08-cv-00326-WHR** |
| | : | **(Judge Walter H. Rice)** |

_____

## PLAINTIFFS' TRIAL BRIEF

Plaintiffs Terry Martin, Deborah Needham, Linda Russell, and Nancy Smith, individually and on behalf of all others similarly situated, through their undersigned counsel, respectfully submit the following Trial Brief for the Court's consideration:

## INTRODUCTION

This class-action lawsuit concerns severe contamination of approximately 540 residential properties in Dayton, Ohio's McCook Field neighborhood— contamination by known and suspected human carcinogens. Plaintiffs allege two underground plumes containing toxic volatile organic compounds[1] ("VOCs") have infiltrated the soil beneath this neighborhood. (Third Amended Complaint, Doc. No. 242, PageID 7083.) These plumes produce toxic vapors that rise through the soil into class members' homes, diminishing property values (*see id.*) and endangering the inhabitants. (*See, e.g.*, EPA Action Memorandum, Doc. No. 254-6, PageID 7418.) These vapors contain trichloroethylene ("TCE"), which "is carcinogenic to people through all routes of exposure"[2] and

---

[1] VOCs are "organic chemical compounds whose composition makes it possible for them to evaporate under normal indoor atmospheric conditions of temperature and pressure." They "of concern as both indoor air pollutants and as outdoor air pollutants." *See Technical Overview of Volatile Organic Compounds*, U.S. EPA, https://www.epa.gov/indoor-air-quality-iaq/technical-overview-volatile-organic-compounds (last visited Apr. 13, 2022).

[2] *Fact Sheet on Trichloroethylene*, U.S. EPA, https://tinyurl.com/yddv2uk2 (last visited Apr. 13, 2022).

tetrachloroethylene ("PCE," a/k/a "PERC"), which the U.S. EPA classifies "as likely to be carcinogenic to humans."[3]

## FACTS PLAINTIFFS WILL PROVE AT TRIAL

The U.S. EPA has declared the area a Superfund site. (Health Assessment, Doc. No. 254-26, PageID 7698.) Of the 395 properties tested for TCE, 174 had indoor levels of TCE exceeding federal safety standards. (*Id.* at 7722.) Fifty-three others had sub-slab (*i.e.*, crawl space) levels of TCE exceeding those standards. (*Id.*) As of January 2013, 228 properties had vapor abatement systems installed to decrease indoor and sub-slab levels of TCE, with six more pending. (*Id.* at 7689.) These efforts, however, have not resolved the contamination.

Two overlapping plumes are at issue here. The first is the Behr-DTP [Dayton Thermal Products] Groundwater Plume, which the U.S. and Ohio EPAs have determined largely originates from the Behr Dayton Thermal Products Facility ("Chrysler-Behr Facility").[4] (*See id.* at 7688–89.) This plume lies beneath hundreds of residential properties south of the Chrysler-Behr Facility. (*See* Health Assessment, Doc. No. 254-26, PageID 7722, 7725–26.) The evidence will establish the following regarding the separate tortfeasors:

## I. Old Carco, LLC's Liability

The Behr-DTP plume was created from releases of TCE and PCE at the Chrysler-Behr Facility. (*See, e.g.*, Kelley Dep. 119:9–124:24, Doc. No. 254-8, PageID 7450–51.) Old Carco, LLC is the relevant successor entity to Chrysler for purposes of this litigation.

---

[3] *See Tetrachloroethylene (Perchloroethylene)*, U.S. EPA, https://tinyurl.com/ybxbwgds (last visited Apr. 13, 2022).

[4] DaimlerChrysler (formerly the Chrysler Corporation) manufactured vehicle air conditioning and engine-cooling systems at the site from 1937 until 2002, when Behr America assumed operations there. (Health Assessment, Doc. No. 254-26, PageID 7692.)

Beginning in approximately 1937, Chrysler owned, operated, and was responsible for an automotive parts and analytical instruments facility at 1600 Webster Street, in Dayton Ohio ("the Behr Facility"). Defendant Behr purchased the Behr Facility from Chrysler in 2002. Throughout Chrysler's seven decades of operating of the Behr Facility, it used or released various volatile organic chemicals ("VOCs"), including TCE and PCE.

As early as November 19, 1987, Chrysler documented the presence of an oil/water mixture in a hole that it had drilled through concrete floor of Building 40B of the Behr Facility, a hole it needed to install a guard post. Shortly afterwards Chrysler discovered that the liquid in that hole was heavily contaminated with TCE and PCE. (Hagemann Rept. at 12, Doc No 379-2, PageID 18099.)

Over the next four years, it became even more clear that contamination with chlorinated solvents, including TCE and PCE, was widespread across the site and was at risk of migrating to the residential area immediately south of the facility. For example, a June 28, 1991 "RECON" report prepared for Chrysler indicated the releases at the Chrysler-Behr Facility were not only historical, but included current practices:

- "chlorinated solvents have been released over a period of time up to the present and apparently from several sources." (at BEHREPA 0001861, Doc No 379-3, PageID 18170.)

- "chlorinated solvents have been found in sediments under the cement floor in Buildings 40A and 40B" including the "current location of the freon degreasing operation" and the "present location of the 1,1,1-trichloroethane degreasing operation"; (Id.; see also BEHREPA 0001839 ("Results indicated the likely source of the contaminant was the freon degreasing operation located immediately west of the wall of Building 40B"));

- "several other areas were identified that contain concentrations of chlorinated vocs that may indicate potential sources of groundwater contamination," including an area "adjacent the 1,1,1-trichloroethane tanks."

It found high levels of TCE in Buildings 40A and 40B, and the highest "near the [current] freon degreasing operation" and selected other areas (BEHREPA 0001849 Doc No 379-3, PageID 18158; see also BEHREPA 0001876–78, PageID 18185-87, 1892–95, PageID 18201-04 (TCE detected from

shallow soil all the way down to groundwater).) It also found high levels of PCE in that building and

near the freon degreasing operation, in soil and groundwater. (*Id.* at BEHR EPA 0001850, PageID

18159, 1853, PageID 18162, 1900–03, PageID 18209-12.)

The RECON report also indicated the Facility was a continuing source of contamination to

soil and groundwater that would migrate offsite, to the south (where the class areas are):

- "the above areas will probably continue as sources of groundwater contamination until they are removed or isolated"

- "chlorinated VOCs detected in water samples from the upper aquifer near the plant's southern boundary indicate potential for off-site movement of contamination downgradient of the plant."

(*See* BEHREPA 0001861–62, Doc No 379-3, PageID 18170-71.) The report found "upgradient

sources do not appear to have significantly impacted the 5-55 foot aquifer on the plant property"

and an environmental audit "did not identify any obvious, potential sources of chlorinated VOCs

upgradient from the plant."

The RECON report made a number of recommendations. With respect to source control, it

recommended with respect to the 1,1,1 TCA tanks "currently in operation" near Building 53 that

"[c]urrent management practices should be reviewed and <u>practices that allow release of chlorinated</u>

<u>solvents to the environment should be discontinued.</u>" (*Id.* at BEHREPA 0001864, PageID 18173.)

A subsequent report to Chrysler from the same consultant concluded that Chrysler had

contaminated the groundwater with TCE and PCE at levels substantially above the levels considered

safe by USEPA. (Hagemann Rep. at 14–15, Doc No 379-2, PageID 18101-02; Status Report and

Recommendations at BEHREPA 0011353, Doc No 379-4, PageID 18230.) It informed Chrysler

that contamination that had been "detected in water samples from the upper aquifer near the plant's

southern boundary indicate *potential for off-site movement of contamination downgradient of the plant,*" and

"that chlorinated solvents in the subsurface had contaminated over 90 million gallons of

groundwater and posed a risk of *off-site migration.*" *Id.* at 14-15 (emphasis added); BEHREPA

0011375, Doc No 379-4, PageID 18252 ("potential for off-site migration – increases difficulty ($) of

recovery"). These were not legacy impacts; rather, they included impacts from current operations.

For example:

- The report recommended Chrysler "Prevent Identified Sources From Contaminating Aquifer," specifically Building 40B and the TCA tanks south of Building 59. (*Id.* at BEHREPA 0011365, PageID 18242.)

- With respect to "source control" for the "1,1,1-TCA Tanks" it recommended removing the "tank system" from service, which it characterized as a "continuing source" and "improve material management" (*Id.* at BEHREPA 0011366, PageID 18243);

- With respect to source control for Building 40B, it characterized the building as a "continuing source," and recommended Chrysler "*discontinue use of solvents,*" "halt production," "improve material management practices," and "[m]inimize generation of RCRA hazardous waste" (*id.* at BEHREPA 0011367, PageID 18244);

The report included the following schematic that indicated chlorinated solvent waste

including TCE and PCE was at risk of offsite to the south (the direction of the homes and

businesses in the class area) from the areas of Building 40 (site of the post hole incident) and leaks

from the TCA tank system (both identified by Plaintiffs' standard of care expert as negligent):



(BEHREPA 0011372, Doc No 379-4, PageID 18249; Hagemann Dep. 300:22–301:18, Doc No 379-5, PageID 18588-89.) One Chrysler environmental consultant recommended, *inter alia,* that Chrysler "evaluate risks associated with potential for continued releases of chlorinated VOCs from the facility to the soils and aquifer immediately below the facility". *Id.*

In 1989, Chrysler also learned of chlorinated solvent contamination of the Powerhouse Well, a nearby Chrysler operated water well, located just 600 feet away from the post hole in Building 40B. (Hagemann Rep. 13, Doc No 379-2, PageID 18100) Despite an opinion from one of its own managers that pumping out the well into the storm sewer would violate the law and "put the corporation at risk," Chrysler pumped and discharged it anyway. (Hagemann Rep. 14–15, Doc No

379-2, PageID 18101-02.) This discharged at least 90 million gallons of water contaminated with TCE and PCE into the stormwater sewer underlying the class areas. (*Id.* at 14.)

Chrysler also was aware of contamination onsite based on how it looked and smelled. Douglas Orf, the environmental manager at the facility, testified he became aware of VOC contamination in the early 1990s near a recently demolished building on site because of "[d]iscoloration and odors." (Orf Dep. 70:20–71:3, Doc No 379-6, PageID 18763-64.)

Despite all this knowledge, there is no evidence that Chrysler did anything of consequence in the 1980s and 1990s to rectify the problems identified by its consultants, investigate and delineate the contamination, engage in meaningful remediation, and warn the community. (Hagemann Rep. 15–19, Doc No 379-2, PageID 18102-06.)

Over the next seven years Chrysler conducted several additional investigations that confirmed that TCE and PCE contamination was widespread on and under its property and in the groundwater. (Hagemann Rept. at 16-18, Doc No 379-2, PageID 18103-05.) Finally, in 1998 Chrysler tested for, and confirmed that, toxic levels of PCE and TCE were in vapor located beneath properties adjacent to the Chrysler site. *Id.* at 19.

Despite all this knowledge, Chrysler made no effort to capture or contain the off-site TCE and PCE in the groundwater or soil. Instead, Chrysler chose to address only TCE and PCE contamination present on its site, in a highly ineffective manner.

People living south of the Chrysler-Behr Facility were never warned of the threat to their properties and well being. Old Carco alleges it "informed community members of the discovery of solvents in area groundwater" in 2000 and 2002. This is false. The May 2000 meeting was a regular meeting of the McCook Field Neighborhood Association. (Bowling Dep. 31:22–32:3, Doc No 379-7, PageID 18771-72.) *Eleven* residents attended the meeting. (*Id.* 36:14–15, PageID 18776.) Chrysler represented there were no safety, water, or air concerns. (*Id.* at 37:22–38:3, PageID 18777-78.) Even

if this meeting had put residents on notice of the contamination problem, the "area of concern" presented at the meeting is only a small fraction of the plume area and includes only those homes across the street from the plant. (*See* Chrysler Informational Presentation, OldCarco_023483, Doc No 379-8, PageID18795 (identifying a very small "area for additional investigation").)

Concerning the alleged 2002 meeting, Old Carco relies solely on the report of its liability expert, Lee Otte. (*See* Doc. No. 357 at PageID 10465; No. 357-1 at PageID 10484; 357-2 at PageID 10577.) Mr. Otte apparently is relying on a draft 2002 letter from Chrysler. (Doc No 357-2 at PageID 10577.) Assuming this letter was ever sent, it nowhere alerts the community that a problem of groundwater contamination exists that threatens health or property. (MARTIN000015, Doc. No. 379-9, PageID 18813.)

Reflecting the serious environmental liabilities at the site, in 2002, Chrysler sold the Facility to Behr for one dollar ($1.00). (Behr Purchase Agreement, at BEHR 00041302, Doc No 379-10, PageID 18820.) In the purchase agreement, Chrysler agreed to "remediate the Groundwater VOC" to the satisfaction of Ohio EPA's voluntary action program or the satisfaction of any other governmental entity exercising jurisdiction. (*Id.* at BEHR 00041341, PageID 18859.) Chrysler agreed to negotiate the nature of the remedy with the relevant governmental entity and keep Behr informed of the status of those negotiations, and Behr agreed to permit Chrysler to access the facility to perform whatever remediation work was agreed upon. (*Id.* at BEHR 00041342, PageID 18860.)

From 2002 until 2004, Chrysler and Behr operated the Chrysler-Behr Facility pursuant to a joint venture agreement. (January 16, 2008 Letter, from G. Rose, Chrysler to S. Coburn, U.S. EPA, at 5, Doc. No. 379-11, PageID 18890.) It continued to be involved in limited on-site remediation activities that occurred. A groundwater extraction and reinjection system that operated on the Behr-DTP Facility intermittently from July 2004 until January 2009, which did not fully contain groundwater contamination; therefore, groundwater containing TCE and PCE continued to migrate

off- site during that time frame. Prior to July 2004, from June to December 2006, and after January 2009, no groundwater containment system was operating, and groundwater containing TCE and PCE therefore freely migrated off-site. On the whole, these fitful remediation efforts failed to prevent high levels of VOCs from migrating off site into the McCook Field neighborhood. (Kelley Dep. 103:6–17, Doc. No. 254-8, Page ID 7448.)

In 2006, the Ohio Environmental Protection Agency ("OEPA") became aware that the groundwater and soil gas near the Chrysler-Behr Facility was contaminated. (Letter from OEPA Emergency Response & Special Investigations Unit to EPA Emergency Response Branch, Doc. No. 379-13, PageID 18913.) After conducting soil vapor, groundwater and sub-slab sampling of its own, in November 2006 the OEPA formally requested the U.S. EPA's assistance with a time-sensitive removal action in the area. (*Id.*) In doing so, it cited the high levels of indoor air contamination and the fact that the City of Dayton's wellfields are located near the Facility. (*Id.*; *see also* Kelly Dep. at 189:18-190:3, Doc. No. 379-12, PageID 18903-04; Health Assessment, Doc. No. 254-26, PageID 7688.) Sampling results showed levels of TCE in indoor air and sub-slab vapors that far exceeded federal screening levels. (*See* Action Memorandum # 2, Doc. No. 254-18, PageID 7542–43.) Toxic vapors in the McCook Field neighborhood became so severe that concern for students' safety prompted Dayton authorities to local elementary schools. (Health Assessment, Doc. No. 254-26, PageID 7696.) Moreover, the City of Dayton can draw potable water from contaminated groundwater underneath the neighborhood, which raises additional serious public health concerns. (*Id.* at PageID 7687, 7698–99.)

In 2006, the U.S. EPA and Chrysler signed a consent order requiring, in part, that Chrysler install vapor mitigation systems in buildings within the Behr-DTP Plume Area that exhibit indoor VOC contamination. (*See* Administrative Settlement Agreement, Doc. No. 254-20, PageID 7575, 7579, 7585–86.)

In 2007, the U.S. EPA began an emergency removal action[5] which required, in part, that Chrysler install vapor mitigation systems in buildings within the Behr-DTP Plume Area that exhibited indoor air VOC contamination.[6] (Administrative Settlement Agreement, Doc No. 379-14, PageID 18914.) When those systems proved unable to adequately reduce the VOC contamination within some homes, even when there were multiple systems installed, the U.S. EPA also required Chrysler to install and operate a neighborhood Soil Vapor Extraction ("SVE") system, located south of the Chrysler-Behr Facility. (Doc No. 379-12, PageID 18895, 214:18-215:3, 215:9-216:4; *see also* Unilateral Administrative Order.) The neighborhood SVE system, located in a very small portion of the Behr-DTP plume area and which is currently operated by Behr Dayton, merely removes TCE vapors from the soil gas and expels them into the ambient air. (Doc No. 379-12, PageID 18895, 20:11-19, 212:18-213:13.) None of these removal actions address the underlying cause of the vapor intrusion, which is the presence of high levels of TCE and PCE in the groundwater and soil beneath the properties. Until that groundwater contamination is removed, the risk of vapor intrusion remains. (2013 Sweetland Rep. at 110, Doc. No.379-15, PageID 19094.)

---

[5] Remedial actions are designed to "permanently remediate hazardous waste," and are generally "long-term" or "permanent." Removal actions are "clean up or remedial measures taken to respond to immediate threats to public health and safety." *New York v. Next Millennium Realty, LLC*, 732 F.3d 117, 125-26 (2d Cir. 2013); *see also* 42 U.S.C.A. §§ 9601 (23), (24). After a site is listed on the National Priorities List, the U.S. EPA conducts a "remedial investigation / feasibility study" ("RI/FS") at the sites. The RI/FS process characterizes site conditions and the nature and extent of the contamination, fully assesses the risk to human health and to the environment, conducts testing to determine the treatability of the contamination, and develops and evaluates remedial actions at the site. For an explanation of the entire CERCLA process, see Superfund: Cleanup Process, EPA, https://www.epa.gov/superfund/superfund-cleanup-process (last visited Apr. 13, 2015).

[6] Initially, the U.S. EPA made Chrysler responsible for testing the residents' indoor air, installing and upgrading vapor mitigation systems where necessary, and operating the neighborhood SVE system. However, when Chrysler declared bankruptcy in 2009, it refused to perform any further work at the Site. The U.S. EPA then issued a Unilateral Administrative Order requiring Behr Dayton to take responsibility for the tasks previously required of Chrysler.

As a direct result of the actions and inactions of Old Carco and the other defendants, the groundwater, soil and air under, around, in, and on plaintiffs' properties is contaminated with VOCs, including TCE and PCE. (*See generally* Action Memorandum #2, U.S. EPA, Feb. 12, 2008, and Attachments 5-9, Doc. No. 379-17, PageID 16167.) TCE vapor intrusion in McCook Field is so serious that it has required emergency installation of vapor abatement systems at hundreds of properties, which are designed to reduce temporarily—not permanently—the immediate health risk to inhabitants in their homes; they discharge the collected VOC vapors into the outside air of the properties where the collection systems are installed. *Id.* Sampling results for TCE in indoor air, soil gases, sub slab vapors and groundwater far exceed levels deemed safe by federal and state agencies. (*Id.*) According to the U.S. Department of Health and Human Services, the VOC contamination poses a "**Public Health Hazard** to area residents (*See* Health Consultation, Initial U.S. EPA Investigation, Behr VOC Plume Site, U.S. Dept. of Health and Human Services, Agency for Toxic Substances and Disease Registry, Aug. 1, 2008, at 4, Doc. No. 379-18, PageID 19202 (emphasis in original).) According to the City of Dayton:

> [W]e are concerned about the long-term affects [sic] of ground water contamination, due to the high levels of VOCs that continue to migrate off the Behr site. Our concerns include the future health of our residents as well as the economic impact. The *temporary* solution of evacuation of soil gas underlying the structures through vapor abatement systems provides a false sense of security that indoor air concerns will soon be completely remedied. It is particularly troublesome that in at least four homes the vapor abatement system has not been successful in reducing the TCE to acceptable levels, even with upgrades to the systems.

(*See* Letter from R. Young, City Manager, City of Dayton, to R. Karl, Director, Superfund Division, U.S. EPA, Aug. 31, 2007, Doc. No. 379-19, PageID 19203 (emphasis in original).)

In 2009, the site was added to the National Priorities List (*i.e.*, the Superfund Program). (*See generally*, EPA Support Document for Listing, Doc. No., 379-20, PageID 19204.) Remediation activities at the site are supervised by the U.S. EPA.

After Chrysler filed for bankruptcy, the U.S. EPA issued a unilateral administrative order to Behr to continue the removal action that Chrysler had agreed to undertake under the 2006 consent order. (Interim Record of Decision, at 6, Doc. No. 379-21, PageID 19267.) Behr subsequently entered into an agreement for an engineering evaluation and cost analysis in 2013, and for a non-time-critical removal action in 2015 specific to a defined area of groundwater at the southern edge of the facility. (*Id.*) In January 2018, Behr began operating an air sparging/soil vapor extraction system pursuant to the 2015 agreement. (*Id.*)

The U.S. EPA has issued a proposed plan for *interim* mitigation efforts at the Behr Dayton Thermal VOC Plume Site (the "Plan") (Doc. No. 379-22, PageID 19357), after issuing a November 2017 Final Remedial Investigation Report (the "Remedial Investigation Report") (Doc. No. 379-23, PageID 19396). Among many pertinent conclusions in the Plan that substantiate the seriousness of the contamination and the extent of Defendants' liability are the following:

- "The highest concentrations of the PCE and TCE plumes are generally located beneath the MAHLE facility [i.e., the Chrysler-Behr Facility], along the southern boundary of the MAHLE facility extending downgradient, and downgradient of the Aramark facility." (Plan at 10.)

- "[E]levated concentrations are still noted beneath the MAHLE facility where some residual source material is thought to remain." (*Id.* at 12.)

- "[T]he VI pathway is complete for the Site overall and . . . there is a quantitative risk to human health." (*Id.* at 11.)

- "EPA finds that the previous removal actions . . . are not adequately addressing VI in the long term." (*Id.*)

- "Contaminant vapors have migrated through the vadose zone to the indoor air of buildings at the Site." (*Id.* at 13.)

- The proposed interim remedy "would not prevent further lateral or vertical migration of the plume." (*Id.* at 24.)

- "Each of the remedial Alternatives evaluated are interim remedies, and additional remedial measures will likely be needed for the groundwater contamination after they

- 12 -

achieve interim groundwater remedial action objectives." (*Id.* at 25.)

- "It is important to note that although EPA has proposed a Preferred Alternative, it is an interim remedy for the Site. The final remedy for the Site has not yet been proposed or selected." (*Id.* at 27.)

All vapor intrusion mitigation systems in the various options considered by the Plan, including the recommended alternative of air sparging and soil vapor extraction (SVE), will need to continue for 30 years after commencing operations. (*Id.* at 19–20, 24.)[6] This, of course, does not include the cleanup time required by the EPA's anticipated final remedy for the Site, which it has yet to select.

In September 2021, Aramark and MAHLE Behr entered into an agreement to design and implement the EPA's selected interim remedy for the site: an air sparging and soil vapor extraction system targeting specifically those portions of the plume at which the groundwater concentration of TCE is 500 ppb or greater; sampling of occupied structures atop the plume to determine indoor vapor intrusion impacts, and designing vapor intrusion mitigation systems for occupied structures with indoor air impacts that exceed health based screening levels at the time of sampling, or imminently. (*See* 2021 Admin. Ord. on Consent, at 44 (Sec. 1.3(a)–(c)), Doc. No. 379-14, PageID 18957.)

## II.  Behr's Involvement

Chrysler, LLC (n/k/a Old Carco LLC, "Chrysler") owned and operated the Chrysler-Behr Facility from approximately 1937 until Behr purchased it in 2002. (*See* January 16, 2008 Letter, from G. Rose, Chrysler to S. Coburn, U.S. EPA, at 5, Doc. No. 374-1, PageID 15203.) From 2002 until 2004, Chrysler and Behr operated the Chrysler-Behr Facility pursuant to a joint venture agreement. *Id.* From 2004 to the present, Behr alone has owned and operated the Chrysler-Behr Facility. Behr was aware of the presence of VOC contamination in 2002, prior to its purchase of the Chrysler-Behr

Facility. (*See* Rule 30(b)(6) Deposition of Billy Huston, Behr, Tr. 53:1-7, Doc. No. 374-2, PageID 15263.)

Behr purchased Chrysler's Dayton Thermal Products Plant for one dollar ($1.00) in 2002. (Behr Purchase Agreement, at BEHR 00041302, Doc. No. 374-3, PageID 15385.) In the purchase agreement, Chrysler agreed to "remediate the Groundwater VOC"—an undefined term—to the satisfaction of Ohio EPA's Voluntary Action Program. (*Id.* at BEHR 00041341 PageID 15424.) Chrysler agreed to indemnify Behr for damages incurred in failing to remediate in accordance with that program and for damages incurred "as a result of the Groundwater VOC" and as a result for identified "On-Site Materials" for a period of five years after closing, except for "amounts, if any, spent by Purchaser to remediate the Groundwater VOC." (*Id.* at BEHR00041342–44, PageID 15425-27.) Chrysler also agreed to remediate materials on-site, with Behr paying the first $1 million of any remediation cost and any value above $10 million. (*Id.* at BEHR00041342–43, PageID 15423-24.) Chrysler also retained responsibility for payment of certain fines and to remove asbestos and other materials unrelated to this lawsuit. (*Id.* at BEHR00041344–45, PageID 15427-28.) Yet Chrysler retained "no other obligation or liability for the Groundwater VOC" and for the "On-Site Materials." *Id.* From the date of closing, Behr was deemed the "'operator' of the Plant for purposes of environmental, health, and safety laws" and assumed "any other environmental liability relating to the Assets." (*Id.* at BEHR 00041344, PageID 15427.)

Behr took no responsibility for environmental conditions at the site between its purchase of the property for $1.00 in 2002 until Chrysler's bankruptcy in 2009. According to its environmental manager, Billy Huston, during that time Behr did none of its own testing at the site. (Huston 2009 Dep. 84:9-85:2, PageID 15299-300, 122:9–124:1, PageID 15332-34.) In fact, Huston did not learn of the specific contaminants in the plume until public meetings organized by U.S. EPA, which would

have had to occur in 2006 or later given the timeline of U.S. EPA's involvement with the site. (*Id.* at 151:14-152:3, PageID 15361-62.)

Per Huston, Behr did not view environmental due diligence prior to acquisition as its responsibility. (*Id.* at 124:2–22, PageID 15334.) There is no indication it retained an environmental contractor to examine the environmental issues at the site prior to acquisition. (*Id.* at 158:5–19, PageID 15368.) Prior to Chrysler's bankruptcy, it did not review copies of sampling results from Chrysler (*id.* at 85:3-18) or documents Chrysler submitted to Ohio EPA or U.S. EPA (*Id.* at 126:3–8, PageID 15336.) It had not installed any monitoring wells. (*Id.* at 103:22-104:14, PageID 15313-15.) Although Behr recognized it was "the first responsible party unless something else is done" under CERCLA, it had "no real direct responsibility for the remediation at this point as I see it. "it's really not my responsibility to keep the [remediation] system going." (*Id.* at 118:13–20, PageID 15328, *see also* 117:15–16, PageID 15327.) It believed "[w]e have no responsibility to put any kind of stop-gap measures or anything like that." (*Id.* at 118:21–119:5, PageID 15328-29.)

Crucially, Huston admitted at a 2013 deposition that Behr could have prevented contaminants from migrating offsite from 2002 to 2009, but failed to even consider it:

> Q. Are there any steps that Behr could have taken to prevent the groundwater contamination from moving off of the facility between 2002 and 2009?
>
> A. Nothing other than some real major type of a project of some kind. And I don't know what you would do there. I don't really have anything that comes to mind that would be an actual way to fully stop it at that point in time.
>
> Q. Would you agree with me, based on your environmental experience, that there are systems that are available to prevent the off-site migration of contaminants from a facility?
>
> A. They do exist, yeah.
>
> Q. And you testified earlier that Behr did not consider any of those, correct?
>
> A. Because we didn't know that our ally of Chrysler was going to let us down.

(Huston 2013 Dep. 239:5–21, Doc. No. 374-4, PageID 15690.)

- 15 -

A groundwater extraction and reinjection system "intermittently" operated onsite from July 2004 to January 2009. (Sweetland 2013 Report at 17, 53–58, Doc. No. 374-5, PageID 15701, 15725, 15761-66.) Even when it was operating, it was not required to contain all contamination onsite. (*Id.* at 54, PageID 15762.) "Prior to July 2004, from June to December 2005 and after January 2009 no groundwater containment system was operating, and groundwater containing TCE and PCE therefore freely migrated off-site, creating the Behr-DTP Plume." (*Id.* at 54, PageID 15762.) In fact, Ohio EPA concluded in 2009 that the wells were failing to capture the contamination and its "migration is causing an increase in and the spread of contamination in the groundwater outside of the DTP property, thereby endangering human health in violation of Rule 3745-34-07(A) of the Ohio Administrative Code." (*Id.* at 55, PageID 15763.)

Plaintiffs' expert Matthew Hagemann has opined that all of the foregoing conduct of Behr's was negligent and that it foreseeably led to additional, continuing contamination of the class area. (*See* Hagemann Rep. 2, 40–45.)

After Chrysler filed for bankruptcy, the U.S. EPA issued a unilateral administrative order to Behr to continue the removal action that Chrysler had agreed to undertake under the 2006 consent order. (Interim Record of Decision, at 6, Doc. No. 374-7, PageID 15945.) Behr subsequently entered into an agreement for an engineering evaluation and cost analysis in 2013, and for a non-time-critical removal action in 2015 specific to a defined area of groundwater at the southern edge of the facility. (*Id.*) In January 2018, Behr began operating an air sparging/soil vapor extraction system pursuant to the 2015 agreement. (*Id.*)

The U.S. EPA has issued a proposed plan for *interim* mitigation efforts at the Behr Dayton Thermal VOC Plume Site (the "Plan") (Doc. No. 374-8, PageID 16035), after issuing a November 2017 Final Remedial Investigation Report (the "Remedial Investigation Report") (Doc. No. 374-9,

PageID 16075). Among many pertinent conclusions in the Plan that substantiate the seriousness of

the contamination and the extent of Defendants' liability are the following:

- "The highest concentrations of the PCE and TCE plumes are generally located beneath the MAHLE facility [i.e., the Chrysler-Behr Facility], along the southern boundary of the MAHLE facility extending downgradient, and downgradient of the Aramark facility." (Plan at 10.)

- "[E]levated concentrations are still noted beneath the MAHLE facility where some residual source material is thought to remain." (*Id.* at 12.)

- "[T]he VI pathway is complete for the Site overall and . . . there is a quantitative risk to human health." (*Id.* at 11.

- "EPA finds that the previous removal actions . . . are not adequately addressing VI in the long term." (*Id.*)

- "Contaminant vapors have migrated through the vadose zone to the indoor air of buildings at the Site." (*Id.* at 13.)

- The proposed interim remedy "would not prevent further lateral or vertical migration of the plume." (*Id.* at 24.)

- "Each of the remedial Alternatives evaluated are interim remedies, and additional remedial measures will likely be needed for the groundwater contamination after they achieve interim groundwater remedial action objectives." (*Id.* at 25.)

- "It is important to note that although EPA has proposed a Preferred Alternative, it is an interim remedy for the Site. The final remedy for the Site has not yet been proposed or selected." (*Id.* at 27.)

All vapor intrusion mitigation systems in the various options considered by the Plan,

including the recommended alternative of air sparging and soil vapor extraction (SVE), will need to

continue for 30 years after commencing operations. (*Id.* at 19–20, 24.)[6] This, of course, does not

include the cleanup time required by the EPA's anticipated final remedy for the Site, which it has yet

to select.

In September 2021, Aramark and MAHLE Behr entered into an agreement to design and

implement the EPA's selected interim remedy for the site: an air sparging and soil vapor extraction

system targeting specifically those portions of the plume at which the groundwater concentration of

TCE is 500 ppb or greater; sampling of occupied structures atop the plume to determine indoor vapor intrusion impacts, and designing vapor intrusion mitigation systems for occupied structures with indoor air impacts that exceed health based screening levels at the time of sampling, or imminently. (*See* 2021 Admin. Ord. on Consent, at 44 (Sec. 1.3(a)–(c), Doc. No. 374-10, PageID 16192.)

## III.   **Aramark's Involvement**

Defendant Aramark Uniform & Career Apparel, Inc. (together with its predecessor corporations, "Aramark") owns the Aramark Facility, which was used as a dry-cleaning and commercial laundry operation from 1966 to 1992 and which is currently used solely for commercial laundry operations. (*See* Corporate Certificates, Doc. No. 376-1, PageID 16278; *see also* Depo. of L. Bonham at 12:4, 161:3-21, 182:13-21, Doc. No. 376-2, PageID 16285, 87-88).)

Aramark became involved at the facility in 1987, when it acquired Servisco. (Niemann Dep. 11:14–20, Doc. No. 376-3, PageID 16299.) Before and after Aramark's acquisition, the site functioned as an industrial laundry (a process for cleaning textiles that can include wash water or dry cleaning chemicals). (*Id.* at 11:21-12:11, PageID 16299-300; 14:23-24, PageID 16302.) Aramark used PCE as a cleaning agent in its dry-cleaning operations, stored the chemical in an above-ground storage tank located outside the Aramark Facility and periodically filled such tank via tanker truck. (*See, e.g.*, Bonham Dep. at 29:6-20, Doc. No. 376-2, PageID 16286.)

At the time of its acquisition, Aramark was aware of items on site contaminated with PCE. (*Id.* at 24:9–25:2; ARAMARK 000362, Doc. No. 376-3, PageID 16583.) During the closure of an underground storage tank in 1989, a sample was taken from inside the tank, showing VOC contamination (including 6.0 ppm of PCE). (*Id.* at 16:15–21, 19:1–16.) A single soil sample was taken under the tank, which did not detect VOCs. (*Id.* at 16:23–17:3.)

At least as early as 1992, Aramark was aware that there was VOC contamination, primarily PCE, in the Aramark Facility's soil, after it received December 1991 test results regarding the contaminated soil discovered at the Aramark Facility. Hageman Rept. at 45. (*See*, *e.g.*, Depo. of S. Niemann at 15:1-11 Doc. No. 376-3, PageID 16303; *see generally* Soil Vapor Extraction/Air Sparging System Sixth & Final Annual Progress Report, The Wetlands Company, LLC, November 2003, Doc. No. 376-5, PageID 16646 .)

Aramark acknowledged "small spills" and "incidental drips" of VOCs had occurred at the facility. (*Id.* at 215:10–15, PageID 16503.) It admits that groundwater contamination was released from the facility. (*Id.* at 231:23–232:9, PageID 16519-20.)

In 1992 Aramark installed groundwater wells on its property and discovered high levels of PCE and TCE in the groundwater. Some of the wells were located near the southwest corner of the Aramark property and detected high levels of PCE and TCE. (Hagemann Rept. at 48, Doc. No. 376-4, PageID 16638.) The audit commissioned by Aramark identified the potential for off-site migration of contamination and recommended further sampling to establish the extent of groundwater contamination. (*Id.*) Contrary to guidance from a 1985 USEPA Manual and the recommendation of its consultant, Aramark never conducted its own sampling or a thorough analysis of the on-site and off-site contamination cause by its release of PCE into the environment. (Hagemann Rept. at 51, PageID 16641; Niemann Dep. 53:22–54:18, 57:8–16, PageID 16341-42, 45.)

Aramark conducted no remediation activities onsite from the discovery of contamination in 1991 until 1996. (Niemann Dep. 45:23-46:8, PageID 16333-34.) At no point did Aramark fully investigate or characterize the Site.

Beginning in 1996, Aramark operated a vapor extraction remediation system only on its own property, in an effort to control the migration of these contaminants offsite. (*See* Hagemann Rept. at 49, Doc No 379-2, PageID 18136; *see also* Doc. No.376-5, PageID 16646, Niemann Dep. 45:19–22,

PageID 16333.) This remediation system cost $20,000 per year to operate. (Niemann Dep. 101:6–16, PageID 16389.) The system was not designed to preclude the off-site flow of contaminants. It was only designed to reduce the off-site flow. (*Id.* at 140:20–141:12, PageID 16328-29), and, Aramark admits, the groundwater which migrated offsite was still contaminated to some extent even when this system was operating (*id.* at 143:23–144:5, PageID 16331-33). Technology existed at the time to stop off-site flow of contaminated groundwater. (*Id.* at 144:7–145:24, PageID 16333-34.)

In November 2003, Aramark, however, elected to cease operating the remediation system and discontinue annual groundwater monitoring. (Niemann Dep. 61:6–64:2, PageID 16349-52), despite the fact that two of the five sampling wells showed VOC contamination in excess of maximum contaminant levels (MCLs) at the time the system was shut down. (*Id.* at 102:1–22, PageID 16390.) There was no soil sampling conducted when the system was shut down. There was no testing to show a decrease in the soil contamination. (Niemann Dep. 65:10–66:3, PageID 16353-54.) Despite all this, Aramark deemed its cleanup effort "satisfactory." (*Id.* 102:23–103:5, PageID 16390-91.)

Aramark did nothing thereafter to prevent offsite migration. (*Id.* at 71:15–72:1, PageID 16359-60.) Aramark did not do any testing of the wells to see if there was a rebound effect on the levels of contaminants after the shut-down of the SVE system (*id.* at 94:23–95:3, PageID 16382-83), which, Aramark acknowledges, can be important to determining the efficacy of the system (*id.* at 97:6–19, PageID 16385). It has no groundwater sampling data from 2005 to 2011, when the EPA began sampling in the area. (*Id.* 138:1–139:6, PageID 16426-27.)

In 2004 Aramark also ceased operating the monitoring wells it installed in 1992. (*Id.* at 55:9–56:6, PageID 16343-44.) Aramark also never notified the public in the vicinity of the facility concerning off-site migration of VOCs. (*Id.* at 167:2–8, PageID 16455.)

Aramark acknowledged the Aramark facility contributed to the plume, and soil and groundwater at the Aramark facility remains contaminated. (*Id.* at 69:13–70:6, PageID 16357.) It assumes the source of its contamination is likely from former dry cleaning operations on site. (*Id.* at 168:20–169:1, PageID 16456-57.) It never obtained information to determine the volume of off-site migration (*id.* at 78:16–82:8, PageID 16366-70) and did not delineate the extent of PCE contamination from its facility (*id.* at 244:8–245:15, PageID 16532-33).

Accordingly, VOC contamination from the Aramark Facility migrated offsite into the Chrysler-Behr-Aramark Class Area and is the major source of the Aramark Groundwater Plume. (*See* Doc. No. 376-7, PageID 16745-46; Doc. No. 376-5, PageID 16646.)

Plaintiffs have retained an expert, Matthew Hagemann, P.G. who has opined that the foregoing conduct by Aramark was negligent in numerous respects, and foreseeably led to contamination in the Chrysler-Behr-Aramark Plume and the overlying properties. (*See* Hagemann Am. Rep., at 2–3, 45–55, Doc. No. 376-4, PageID 16586, 92-93, 635-45.) A second expert, Nicole Sweetland, Ph.D., has described the impacts of releases at the facility on the surrounding area. For the Court's reference, her 4 reports in this matter are attached to Plaintiffs' Memorandum in Opposition to Old Carco, LLC's motion for summary judgment.

U.S. EPA deems Aramark a potentially responsible party (PRP) for a significant portion of the contamination (Doc. No. 376-8, PageID 16826). In November 2007, the U.S. EPA also sent Aramark a "Special Notice Letter" indicating that it considered Aramark a PRP under CERCLA and "inviting" Aramark to negotiate a Consent Order for a Remedial Investigation and Feasibility Study (RI/FS). (*See* Letter from W. Carney, Chief, Remedial Response Branch #1, U.S. EPA, to Aramark, Doc. No. 376-9, PageID 16830.) Despite this offer, Aramark did little to cooperate with the U.S. EPA, failed to make a good faith offer, argued that it was a minor contributor, and stated it was unwilling or unable to take on any part of the remedial investigation and feasibility study. (*See* Letter

- 21 -

from D. Michaelson, Aramark, to S. Coburn, U.S. EPA; Letter from W. Carney, Chief, Remedial

Response Branch #1, U.S. EPA, to K. McTigue, O'Melveny & Myers LLP, and K. Zimmerman,

Aramark; Email from R. Watterworth, Senior Site Coordinator, OEPA, to B. Nickel and G. Strobel,

March 13, 2008 Doc. No. 376-10, PageID 16841.)

The U.S. EPA has issued a proposed plan for *interim* mitigation efforts at the Behr Dayton

Thermal VOC Plume Site (the "Plan") (Doc. No. 376-11, PageID 16845), after issuing a November

2017 Final Remedial Investigation Report (the "Remedial Investigation Report") (Doc. No. 376-12,

PageID 16885). All vapor intrusion mitigation systems in the various options considered by the

Plan, including the recommended alternative of air sparging and soil vapor extraction (SVE), will

need to continue for 30 years after commencing operations. (*Id.* at 19–20, 24.) This, of course, does

not include the cleanup time required by the EPA's anticipated final remedy for the Site, which it

has yet to select.

In September 2021, Aramark and MAHLE Behr entered into an agreement to design and

implement the EPA's selected interim remedy for the site: an air sparging and soil vapor extraction

system targeting specifically those portions of the plume at which the groundwater concentration of

TCE is 500 ppb or greater; sampling of occupied structures atop the plume to determine indoor

vapor intrusion impacts, and designing vapor intrusion mitigation systems for occupied structures

with indoor air impacts that exceed health based screening levels at the time of sampling, or

imminently. (2021 Admin. Ord. on Consent, at 44 (Sec. 1.3(a)–(c), Doc. No. 379-14, PageID 18957.)

Plaintiffs' groundwater contamination expert Nicole Sweetland, Ph.D. has opined that

Aramark's releases were a major cause of the Aramark-Behr Commingled Plume. Dr. Sweetland is

expected to testify that "[b]uildings overlying the Aramark Plume are subject to vapor intrusion

from the commingled Aramark and Behr-DTP plumes. Buildings overlying the remainder of the

Behr-DTP [Groundwater] Plume, where it is not overlapping with the Aramark Plume, are subject

to vapor intrusion from the Behr-DTP [Groundwater] Plume only"; and that "all buildings overlying the Behr-DTP and Aramark Groundwater Plume are subject to the potential for vapor intrusion and indoor air impacts and will be into the foreseeable future until the groundwater beneath the buildings is remediated." (Doc. No. 376-7, PageID 16753-73).

## CLASSES, CLAIMS, AND LEGAL ISSUES

This class action was filed in 2008 by thirty named Plaintiffs owning property in the McCook Field neighborhood. (Complaint, Doc. No. 2, PageID 17.) Two other class action lawsuits were filed contemporaneously concerning similar allegations.[7] All three cases were consolidated in the district court with the filing of Plaintiffs' Master Amended Class Action Complaint on January 3, 2012. (Doc. No. 118.)[8]

The Third Master Amended Class Action Complaint (Third Amended Complaint, Doc. No. 242) is the operative complaint in this case. It asserts causes of action for trespass, private nuisance, unjust enrichment, strict liability, negligence, negligence *per se*, battery, intentional fraudulent concealment, constructive fraud, negligent misrepresentation, and civil conspiracy. (Third Amended Complaint, Doc. No. 242, PageID 7103–26.) The operative complaint alleges Defendants "have contaminated Plaintiffs' water, soil, vegetation, air, land, and dwellings, thereby causing Plaintiffs to suffer damage to their properties and personal finances, interference with their exclusive possession

---

[7] These actions were *First Property Group, Ltd.,* et al. *v. Behr Dayton Thermal Products, LLC,* et al., No. 3:08-CV-00329 (D. Ohio filed Sept. 17, 2008); and *Kimberly Spears,* et al. *v. Chrysler LLC,* et al., No. 3:08-CV-00331 (D. Ohio filed Sept. 18, 2008).

[8] The action was stayed from May 7, 2009 until April 14, 2011 due to Chrysler's bankruptcy proceedings. (*See* Order Staying Action, Doc. No. 74, Page ID 1052; Order Granting Motion to Lift Stay, Doc. No. 92, Page ID 1117.) Old Carco, LLC, which retains certain liabilities of Chrysler's, including this action, remains a nominal defendant to allow Plaintiffs to pursue applicable insurance policies. (Third Amended Complaint, Doc. No. 242, Page ID 7082 n.1.)

of their properties, loss of the use and enjoyment of their properties and destruction of their

community." (Doc No. 242, at ¶ 1 PageID 7083, *see also* ¶¶ 17–20, 29, 57, PageID 7086–89, 7095.)

In seeking class certification, Plaintiffs proposed the following class definitions:

Chrysler-Behr Class: All persons who on or after April 1, 2006 owned property
located within the Chrysler- Behr Class Area, which is geographically depicted by the
yellow shaded area on [Dock. No. 254-5, PageID 7416].

Chrysler-Behr-Aramark Class: All persons who on or after April 1, 2006 owned
property located within the Chrysler-Behr-Aramark Class Area, which is
geographically depicted by the red shaded area on [Doc. No. 254-5, PageID 7416].

(Plaintiffs' Class Certification Memorandum, Doc. No. 254-1, PageID 7376–77.)[9]

In the Amended Renewed Motion for Class Certification, Plaintiffs sought class certification

as to liability only for the following five causes of action: private nuisance, negligence, negligence *per

se*, strict liability, and unjust enrichment. (Class Certification Memorandum, Doc. No. 254-1, PageID

7377.) Alternatively, Plaintiffs sought—and the Court sustained—certification for the following

seven common issues (hereinafter "Common Issues"), to be resolved on a classwide basis:

1. Each Defendant's role in creating the contamination within their respective
   Plumes, including their historical operations, disposal practices, and chemical
   usage;

2. Whether or not it was foreseeable to Chrysler and Aramark that their improper
   handling and disposal of TCE and/or PCE could cause the Behr-DTP and
   Aramark Plumes, respectively, and subsequent injuries;

3. Whether Chrysler, Behr, and/or Aramark engaged in abnormally dangerous
   activities for which they are strictly liable;

4. Whether contamination from the Chrysler-Behr Facility underlies the Chrysler-

_____

[9] Excluded from the class definition are (1) persons who own industrial property within the Class
Areas; (2) the Defendants in this action (and their officers, directors, agents, employees and
members of their immediate families), (3) any entity in which the Defendants have a controlling
interest, (4) the legal representatives, heirs, successors and assigns of Defendants; and (5) the judicial
officers to whom this case is assigned, including their staff and the members of their immediate
families.

Behr and Chrysler-Behr-Aramark Class Areas;

5. Whether contamination from the Aramark Facility underlies the Chrysler-Behr-Aramark Class Area;

6. Whether Chrysler and/or Aramark's contamination, and all three Defendants' inaction, caused class members to incur the potential for vapor intrusion; and

7. Whether Defendants negligently failed to investigate and remediate the contamination at and flowing from their respective Facilities.

(Class Certification Memorandum, Doc. No. 254-1, PageID 7392–93, 7405.) The Court ultimately overruled Plaintiffs' request to certify a limited number of causes of action on liability, but sustained Plaintiffs' request to certify the foregoing 7 issues for classwide treatment.

Following briefing on dispositive motions, the Court entered an order that sustained Plaintiffs' Motion for Partial Summary Judgment on Issues 4 and 5, sustained Defendants' Motion for Summary Judgment on Issue 3, and sustained Defendant Aramark's Motion for Summary Judgment on Issue 2. (Doc. No. 393.)

## EXPERTS

Plaintiffs will call Matt Hagemann, P.G., C.Hg. to testify as an expert on standard of care and foreseeability. The Court has previously received Mr. Hagemann's report on several occasions. (*See, e.g.*, Doc. No. 379-2, PageID 18085 et seq.) Mr. Hagemann is a professional geologist and hydrogeologist and environmental consultant with long service at the U.S. Environmental Protection Agency. His credentials are summarized on pp. 5–8 of his report (Doc. No. 379-2 at PageID 17219–23.)

Plaintiffs anticipate that Mr. Hagemann will testify that Old Carco breached the standard of care in negligent handling and disposal of TCE and PCE, and negligent investigation and remediation of the plume areas. He will also testify that Aramark and MAHLE Behr negligently investigated and remediated the plume areas. Mr. Hagemann will testify that the contamination of

the class areas and resulting injuries were foreseeable results of the Defendants' negligence. The Court has overruled a *Daubert* challenge to Mr. Hagemann's testimony. (Doc. No. 394.) Given the persuasiveness of Mr. Hagemann's testimony, and the overwhelming evidence of Defendants' negligence as recited above, Plaintiffs are confident of a favorable finding on liability. Defendants' experts have not and cannot adequately explained Defendants' decades of inaction despite repeated notice of serious contamination of their properties and areas downgradient of them.

Plaintiffs will also call Nicole Sweetland, Ph.D. to testify on causation, specifically pertaining to issues of hydrogeology. Dr. Sweetland's reports in this litigation have been previously submitted to the Court. (*See* Doc. Nos. 379-15, 379-24, 379-25, 379-26.) Her work was the basis of the delineation of the two class areas. She is expected to offer testimony on all areas within the scope of her disclosures and deposition testimony in this case, with a focus on the scope and features of the plume areas, when they were created, their connection to Defendants' properties, and their connection to vapor intrusion across the plume areas. Again, given the overwhelming evidence in the factual record concerning the Defendants' conduct, their undisputed contributions to the plume areas (as reflected in resolution of Issues 4 and 5 in Plaintiffs' favor), and the serious methodological problems in the work of two of the three other hydrogeology experts in this case (*see* Doc. No. 384), Plaintiffs are confident a jury will find in their favor on issues of causation.

Thank you for your Honor's assistance throughout this litigation. Please contact counsel should you have any questions or require any additional information.

Dated: September 8, 2022                    Respectfully submitted,

                                           /s/ Patrick Thronson
                                           JANET, JANET & SUGGS, LLC
                                           Kenneth M. Suggs (pro hac vice)
                                           Patrick A. Thronson (pro hac vice)
                                           4 Reservoir Circle, Suite 200
                                           Baltimore, MD 21208
                                           Telephone: (410) 653-3200
                                           pthronson@jjsjustice.com

                                           GERMAN RUBENSTEIN, LLP
                                           Steven J. German, Esq. (pro hac vice)
                                           Joel M. Rubenstein, Esq. (pro hac vice)
                                           19 West 44th Street, Suite 1500
                                           New York, NY 10036
                                           Telephone: (212) 704-2020
                                           sgerman@germanrubenstein.com
                                           jrubenstein@germanrubenstein.com

                                           NATIONAL LEGAL SCHOLARS, P.C.
                                           Ned Miltenberg (to apply pro hac vice)
                                           5410 Mohican Road, Suite 200
                                           Bethesda, MD 20816
                                           nedmiltenberg@gmail.com

                                           BRANNON & ASSOCIATES
                                           Douglas D. Brannon, Esq.
                                           130 West Second Street, Suite 900
                                           Dayton, OH 45402
                                           Telephone: (937) 228-2306
                                           dougbrannon@branlaw.com

                                           *Attorneys for Plaintiffs Terry Martin,*
                                           *Linda Russell, Nancy Smith, and*
                                           *Deborah Needham,*
                                           *On Behalf of Themselves and*
                                           *All Others Similarly Situated*